Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
Frank P. Tiscione (FT 5396)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE  COMPANY and GEICO
CASUALTY COMPANY,

                            Plaintiffs,

               -against-

FRANCOIS JULES PARISIEN, M.D. a/k/a JULES
FRANCOIS PARISIEN, CHARLES DENG, L.Ac.,
ISLAND LIFE CHIROPRACTIC PAIN CARE, PLLC,
DARREN THOMAS MOLLO, D.C., MARIA S.
MASIGLA, P.T., FRANCIS J. LACINA, M.D., KSENIA
PAVLOVA, D.O., ALLAY MEDICAL SERVICES, P.C.,
LUQMAN DABIRI, M.D., NOEL E. BLACKMAN, M.D.,
SUSAN TUANO, WILMA TANGLAO, and JOHN DOE
DEFENDANTS 1-10,

                            Defendants.

------------------------------------------------------------------------X

16-818

Docket No.:_____ (        )

**Plaintiff Demands a Trial
by Jury**

## COMPLAINT

    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $893,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable healthcare services, including patient examinations, diagnostic testing, pain management injections, chiropractic services, acupuncture services, and physical therapy services (collectively, the "Fraudulent Services"), that allegedly were provided to New York automobile accident victims ("Insureds") at a purported multidisciplinary clinic located at 1786 Flatbush Avenue, Brooklyn, New York (the "Flatbush Avenue Clinic").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $4,500,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Defendants Island Life Chiropractic Pain Care, PLLC, Jules Francois Parisien, M.D., Charles Deng, L.Ac., Darren Thomas Mollo, D.C., Maria S. Masigla, P.T., Francis J. Lacina, M.D., Ksenia Pavlova, D.O., Allay Medical Services, P.C., Luqman Dabiri, M.D., and Noel E. Blackman, M.D., because:

    (i)      the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

    (ii)     in many cases, the Fraudulent Services never were provided in the first instance;

    (iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

    (iv)     the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others;

(v)     in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Defendants or their employees;

(vi)    Defendants Island Life Chiropractic Pain Care, PLLC and Allay Medical Services, P.C. were fraudulently incorporated, owned, and controlled by unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits;

(vii)   Defendants Island Life Chiropractic Pain Care, PLLC, Jules Francois Parisien, M.D., Charles Deng, L.Ac., Darren Thomas Mollo, D.C., Maria S. Masigla, P.T., Francis J. Lacina, M.D., Ksenia Pavlova, D.O., Allay Medical Services, P.C., Luqman Dabiri, M.D., and Noel E. Blackman, M.D. unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits; and

(viii)  in many cases, the Defendants failed and/or refused to provide additional verification of their no-fault insurance claims by appearing for examinations under oath, which constituted a material breach of a condition of coverage and relieved GEICO of its obligation to pay the claims.

3.      The Defendants fall into the following categories:

(i)     Defendants Island Life Chiropractic Pain Care, PLLC ("Island Life"), Francois Jules Parisien a/k/a Jules Francois Parisien, M.D. ("Parisien"), Charles Deng, L.Ac. ("Deng"), Darren Thomas Mollo, D.C. ("Mollo"), Maria S. Masigla, P.T. ("Masigla"), Francis J. Lacina, M.D. ("Lacina"), Ksenia Pavlova, D.O. ("Pavlova"), Allay Medical Services, P.C. ("Allay Medical"), Luqman Dabiri, M.D. ("Dabiri"), and Noel E. Blackman, M.D. ("Blackman")(collectively the "Provider Defendants") are medical, chiropractic, acupuncture, and physical therapy providers, through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO.

(ii)    Defendants Susan Tuano ("Tuano"), Wilma Tanglao ("Tanglao"), and John Doe Defendants 1-10 (collectively the "Management Defendants") are not and never have been licensed as physicians, chiropractors, acupuncturists, or physical therapists, yet nonetheless secretly and unlawfully owned, controlled, and derived economic benefit from the Provider Defendants' healthcare practices in contravention of New York law.

4.      As discussed below, Defendants at all relevant times have known that:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    in many cases, the Fraudulent Services never were provided in the first instance;

(iii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)    the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others;

(v)     in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Defendants or their employees;

(vi)    Defendants Island Life Chiropractic Pain Care, PLLC and Allay Medical Services, P.C. were fraudulently incorporated, owned, and controlled by unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits;

(vii)   Defendants Island Life Chiropractic Pain Care, PLLC, Jules Francois Parisien, M.D., Charles Deng, L.Ac., Darren Thomas Mollo, D.C., Maria S. Masigla, P.T., Francis J. Lacina, M.D., Ksenia Pavlova, D.O., Allay Medical Services, P.C., Luqman Dabiri, M.D., and Noel E. Blackman, M.D. unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits; and

(viii)  in many cases, the Defendants failed and/or refused to provide additional verification of their no-fault insurance claims by appearing for examinations under oath, which constituted a material breach of a condition of coverage and relieved GEICO of its obligation to pay the claims.

5.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed to GEICO.

6.      The charts annexed hereto as Exhibits "1" – "8" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

7.      The Defendants' fraudulent scheme began as early as 2013 and has continued uninterrupted through present day.

4

8.     As a result of the Defendants' scheme, GEICO has incurred damages of more than $893,000.00.

## THE PARTIES

**I.     Plaintiffs**

9.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.     Defendants**

10.    Defendant Mollo resides in and is a citizen of New York. Mollo was licensed to practice chiropractic in New York on September 23, 1999, falsely purported to own Defendant Island Life, and purported to provide many of the Fraudulent Services.

11.    Defendant Island Life is a fraudulently incorporated New York chiropractic professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

12.    Defendant Deng resides in and is a citizen of New York. Deng was licensed to practice acupuncture in New York on January 3, 1994, and purported to provide many of the Fraudulent Services.

13.    Defendant Parisien resides in and is a citizen of New York. Parisien was licensed to practice medicine in New York on January 25, 1972, and purported to provide many of the Fraudulent Services.

5

14.     Defendant Masigla resides in and is a citizen of New York. Masigla was licensed to practice physical therapy in New York on March 24, 1999, and purported to provide many of the Fraudulent Services.

15.     Defendant Lacina resides in and is a citizen of New York. Lacina was licensed to practice medicine in New York on September 26, 2012, and purported to provide many of the Fraudulent Services.

16.     Defendant Pavlova resides in and is a citizen of New York. Pavlova was licensed to practice medicine in New York on May 7, 2013, falsely purported to own Defendant Allay Medical, and purported to provide many of the Fraudulent Services.

17.     Defendant Allay Medical is a fraudulently incorporated New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

18.      Defendant Dabiri resides in and is a citizen of New York. Dabiri was licensed to practice medicine in New York on January 10, 2013, and purported to provide many of the Fraudulent Services.

19.     Dabiri has a long and disturbing professional disciplinary history.

20.     For instance, between 1994 and 1999, Dabiri practiced medicine in the United Kingdom. In 1999 – after receiving a report which indicated that Dabiri appeared to be suffering from delusions – the United Kingdom's General Medical Council ("UKGMC") determined that Dabiri's fitness to practice medicine was seriously impaired. As a result, Dabiri's license to practice medicine in the United Kingdom was suspended.

6

21.   Thereafter, Dabiri emigrated to the United States and, in 2007, applied for a medical license in Florida.

22.   In light of Dabiri's professional disciplinary history in the United Kingdom, on or about February 26, 2009 the Florida Board of Medicine (the "Florida Board") agreed to grant Dabiri a medical license, but only on the condition that he practice under the supervision of a physician approved by the Florida Board for a period of one year.

23.   Dabiri was well-aware of the condition that the Florida Board had imposed on his medical license, inasmuch as he applied to the Florida Board to lift the condition on two separate occasions.

24.   Even so, Dabiri did not comply with the condition imposed by the Florida Board, and practiced medicine in Florida without a supervising physician approved by the Florida Board.

25.   As a result, on or about April 19, 2013, the Florida Department of Health instituted professional disciplinary charges against Dabiri, and – ultimately – suspended Dabiri's medical license and fined him.

26.   Thereafter, on August 7, 2014, the New York State Board for Professional Medical Conduct (the "State Board") instituted its own disciplinary charges against Dabiri, based on the discipline Dabiri had received in Florida.

27.   On or about January 8, 2015, the State Board suspended Dabiri's medical license.

28.   On or about July 30, 2015, Dabiri's New York medical license was reinstated, subject to a five-year period of probation, during which he is permitted to practice medicine only when monitored by a board-certified physician approved by the New York State Department of Health Office of Professional Medical Conduct, among many other conditions.

29.     Defendant Blackman resides in and is a citizen of New York. Blackman was licensed to practice medicine in New York on April 11, 1980, and purported to provide many of the Fraudulent Services.

30.     Blackman also has a disturbing professional disciplinary history.

31.     Specifically, on or about June 14, 2004, the State Board charged Blackman with repeated negligence and failure to maintain accurate patient records in connection with his treatment of three patients.

32.     As the result of Blackman's negligence, one of the patients' right arms had to be amputated.

33.     Blackman could not successfully defend against the charges and, as a result, on June 25, 2004 the State Board subjected him to a two-year period of probation, during which he was – among other things – permitted to practice medicine only when monitored by a board-certified physician approved by the New York State Department of Health Office of Professional Medical Conduct.

34.     In addition, on February 7, 2016, Blackman was arrested for illegally prescribing vast amounts of oxycodone – 365,000 pills in 2015 alone.  Federal authorities arrested Blackman at Kennedy Airport after they ordered a plane bound to Guyana back from the airport terminal in which Blackman was a passenger.

35.     According to Blackman's prescription records, the 365,000 pills came from 2,487 prescriptions from multiple clinic locations in Franklin Square, Elmhurst, Queens, and Brooklyn. Blackman was charged in the Eastern District of New York, Central Islip, for conspiracy to distribute oxycodone.  Blackman is currently being held as a flight risk.

36.     Blackman's secretary was also arrested on the same narcotics conspiracy charge. When Blackman's secretary was arrested, she advised federal agents that an unnamed person would give her a list of names and Blackman would write oxycodone prescriptions without examining the patients.  Blackman was paid $300 for each prescription.

37.     Defendant Tuano resides in and is a citizen of New York. Tuano never has been a licensed physician, chiropractor, acupuncturist, or physical therapist, yet has owned, controlled, and derived economic benefit from Island Life, Allay Medical, and the Provider Defendants' unincorporated medical, chiropractic, acupuncture, and physical therapy practices in contravention of New York law.

38.     Defendant Tanglao resides in and is a citizen of New York. Tanglao never has been a licensed physician, chiropractor, acupuncturist, or physical therapist, yet has owned, controlled, and derived economic benefit from Island Life, Allay Medical, and the Provider Defendants' unincorporated medical, chiropractic, acupuncture, and physical therapy practices in contravention of New York law.

39.     Upon information and belief, John Doe Defendants 1 – 10 reside in and are citizens of New York. John Doe Defendants 1 – 10 are individuals and entities, presently not identifiable, who are not and never have been licensed as physicians, chiropractors, acupuncturists, or physical therapists, yet – together with Tuano and Tanglao – have owned, controlled, and derived economic benefit from Island Life, Allay Medical, and the Provider Defendants' unincorporated medical, chiropractic, acupuncture, and physical therapy practices in contravention of New York law.

**JURISDICTION AND VENUE**

40.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

41.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.

42.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

43.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

**I.      An Overview of the No-Fault Laws and Licensing Requirements**

44.     GEICO underwrites automobile insurance in New York.

45.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)(collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

46.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

47.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company within forty-five days of the date of service and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

48.    Pursuant to the No-Fault Laws, healthcare providers are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

49.    For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … .

50.    In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may <u>not</u>: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to

operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

51.     New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

52.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it pays or receives unlawful kickbacks in exchange for patient referrals.

53.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

54.     Pursuant to the No-Fault Laws, only healthcare providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

55.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not

eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

56.    Pursuant to New York State Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

57.    The No-Fault Laws obligate individuals and healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification, including examinations under oath, in order to establish proof of their claims.

58.    The prescribed no-fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 provides, in part, that "upon request by the Company, the eligible injured person or that person's assignee . . . shall (b) as may reasonably be required, submit to an examination under oath by any person named by the Company, and shall subscribe to same . . . , and (d) provide any other pertinent information that may assist the Company in determining the amount that is payable."

59.    The prescribed no-fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 also states that "[n]o action shall lie against the Company, unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage."

60.    In addition, 11 N.Y.C.R.R. § 65-3.5 states, in pertinent part, that:

(i)    Subsequent to the receipt of one or more of the completed verification forms, any additional verification required by the insurer to establish proof of claim shall be requested within 15 business days of receipt of the prescribed verification forms. Any requests by an insurer for additional verification need not be made on any prescribed or particular form. . . .

(ii)     The insurer is entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested.

(iii)    All examinations under oath . . . requested by the insurer shall be held at a place and time reasonably convenient to the applicant. . . . The insurer shall inform the applicant at the time the examination is scheduled that the applicant will be reimbursed for any loss of earnings and reasonable transportation expenses incurred in complying with the request.  When an insurer requires an examination under oath of an applicant to establish proof of claim, such requirement must be based upon the application of objective standards so that there is specific objective justification supporting the use of such examination. . . .

61.     Because an examination under oath is a condition of coverage, an insurer may deny a healthcare provider's or individual's claim for No-Fault Benefits if the healthcare provider or individual claimant fails or refuses to appear for an examination under oath.

## II.     The Defendants' Fraudulent Scheme

62.     Beginning in 2013, and continuing through the present day, the Defendants have masterminded and implemented a series of interrelated fraudulent schemes in which they billed GEICO and other insurers for millions of dollars in No-Fault Benefits they never were entitled to receive.

## A.     The Fraudulent Establishment of the Provider Defendants' Healthcare Practices

63.     In 2013, the Management Defendants controlled the Flatbush Avenue Clinic, and wanted to begin to submit fraudulent, multidisciplinary no-fault insurance billing to GEICO and other insurers.

64.     However, the Management Defendants were not licensed in any healthcare professions, and therefore could not use the Flatbush Avenue Clinic to submit fraudulent, multidisciplinary no-fault insurance billing under their own names.

65.     Accordingly, the Management Defendants commenced a search for licensed physicians, chiropractors, acupuncturists, and physical therapists who would be willing to sell

14

the use of their professional licenses to the Management Defendants, so that they could use the professional licenses to submit large-scale billing for the Fraudulent Services to GEICO and other insurers.

66.    Thereafter, between late 2013 and mid-2015, the Management Defendants recruited Pavlova, Parisien, Deng, Mollo, Masigla, Dabiri, Lacina, and Blackman, licensed healthcare providers who were willing to sell the use of their licenses to the Management Defendants, pose as the nominal or "paper" owners of healthcare practices that would operate from the Flatbush Avenue Clinic, while in actuality ceding true ownership and control over the practices to the Management Defendants.

67.    Specifically, in or about August 2013, in exchange for compensation from the Management Defendants, Parisien and Pavlova agreed to serve as the nominal or "paper" owners of two ostensibly distinct medical practices that would operate from the Flatbush Avenue Clinic.

68.    Also, in or about August 2013, in exchange for compensation from the Management Defendants, Deng agreed to serve as the nominal or "paper" owner of an acupuncture practice that would operate from the Flatbush Avenue Clinic.

69.    Then, in or about September 2013, in exchange for compensation from the Management Defendants, Mollo agreed to serve as the nominal or "paper" owner of a chiropractic practice that would operate from the Flatbush Avenue Clinic.

70.    In addition, in or about September 2013, in exchange for compensation from the Management Defendants, Mollo agreed to cede control over Island Life to the Management Defendants, and permit Island Life to operate from the Flatbush Avenue Clinic under the control of the Management Defendants.

71.     What is more, in or about September 2013, in exchange for compensation from the Management Defendants, Masigla agreed to serve as the nominal or "paper" owner of a physical therapy practice that would operate from the Flatbush Avenue Clinic.

72.     Thereafter, in or about January 2014, in exchange for compensation from the Management Defendants, Dabiri agreed to serve as the nominal or "paper" owner of a medical practice that would operate from the Flatbush Avenue Clinic.

73.     Then, in or about April 2014, in exchange for compensation from the Management Defendants, Blackman agreed to serve as the nominal or "paper" owner of a medical practice that would operate from the Flatbush Avenue Clinic.

74.     In addition, in or about December 2014, in exchange for compensation from the Management Defendants, Lacina agreed to serve as the nominal or "paper" owner of a medical practice that would operate from the Flatbush Avenue Clinic.

75.     Finally, in or about June 2015, in exchange for compensation from the Management Defendants, Pavlova  agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she was the true shareholder, director and officer of Allay Medical and that she truly owned and controlled the professional corporation.

76.     Once Allay Medical was fraudulently incorporated on about June 29, 2015, Pavlova ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

77.     In keeping with the fact that the Provider Defendants did not truly own or control the healthcare practices at the Flatbush Avenue Clinic, the Management Defendants – rather than

16

the Provider Defendants – provided all start-up costs and investment in the healthcare practices at the Flatbush Avenue Clinic.

78.     The Provider Defendants did not incur any costs to establish the healthcare practices they purported to own and operate at the Flatbush Avenue Clinic, nor did they invest any money in the healthcare practices they purported to own and operate at the Flatbush Avenue Clinic.

79.     The Provider Defendants never truly owned or controlled the healthcare practices that operated under their licenses at the Flatbush Avenue Clinic.

80.     True ownership and control over the healthcare practices that operated from the Flatbush Avenue Clinic under the Provider Defendants' licenses rested at all times entirely with the Management Defendants. The Management Defendants used the façade of the Provider Defendants' proprietorship over the healthcare practices to do indirectly what they were forbidden from  doing directly, namely: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

81.     The Provider Defendants exercised absolutely no control over or ownership interest in the practices operated under their licenses at the Flatbush Avenue Clinic. All decision-making authority relating to the operation and management of the practices at the Flatbush Avenue Clinic  was vested entirely with the Management Defendants.

82.     For instance, Pavlova, Parisien, Deng, Mollo, Masigla, Dabiri, Lacina, and Blackman: (i) neither controlled nor maintained any of the books or records of the practices operated under their licenses at the Flatbush Avenue Clinic, including the bank accounts for the practices; (ii) never selected, directed, and/or controlled any of the individuals or entities

17

responsible for handling any aspect of the practices' financial affairs; (iii) never hired or supervised any of the practices' employees or independent contractors; and (iv) were completely unaware of the most fundamental aspects of how the practices operated at the Flatbush Avenue Clinic.

83.      The only thing that Pavlova, Parisien, Deng, Mollo, Masigla, Dabiri, Lacina, and Blackman actually did during her tenure as the paper owners the practices that operated under their licenses at the Flatbush Avenue Clinic under the Management Defendants' control was to occasionally perform some of the Fraudulent Services. In reality, Pavlova, Parisien, Deng, Mollo, Masigla, Dabiri, Lacina, and Blackman were nothing more than the Management Defendants' de facto employees.

84.      To conceal their true ownership of and control over the Provider Defendants' healthcare practices at the Flatbush Avenue Clinic, while simultaneously effectuating pervasive, total control over the operation and management of the practices, the Management Defendants arranged to have the Provider Defendants enter into a series of "management", "billing", "marketing", "consulting", and "lease" agreements with themselves. These agreements have called for exorbitant payments from the Provider Defendants' healthcare practices to the Management Defendants, for space at the Flatbush Avenue Clinic and the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of the healthcare practices' businesses; or (ii) the income generated by the healthcare practices.

85.      While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "consulting", and "marketing" services, or facility space and equipment, they actually have been used solely as a tool to permit the

Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the healthcare practices operated under the Provider Defendants' licenses at the Flatbush Avenue Clinic; and (ii) to siphon all of the profits that have been generated by the billings submitted to GEICO and other insurers through the healthcare practices operated under the Provider Defendants' licenses at the Flatbush Avenue Clinic.

86.     The net effect of these "management", "billing", "marketing", and "lease" agreements between the Provider Defendants and the Management Defendants was to maintain the healthcare practices at the Flatbush Avenue Clinic in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the practices, their accounts receivable, and any revenues that might be generated therefrom.

**B.     The Defendants' Fraudulent Treatment and Billing Protocol**

87.     Virtually all of the Insureds in the claims identified in Exhibits "1" – "8" whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

88.     Even so, the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit through the Provider Defendants to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

19

89.    The Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

90.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

91.    No legitimate licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

92.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because the healthcare practices that operated under the Provider Defendants' licenses at the Flatbush Avenue Clinic were not truly owned or controlled by licensed healthcare providers.

93.    Rather, the healthcare practices that operated under the Provider Defendants' licenses at the Flatbush Avenue Clinic were truly owned and controlled by the Management Defendants, whose focus was on profit, rather than patient care.

1.    **The Fraudulent Kickbacks**

94.    In keeping with the fact that the healthcare practices that operated under the Provider Defendants' licenses at the Flatbush Avenue Clinic were not truly owned or controlled by the Provider Defendants, the Provider Defendants did not advertise or market their services at the Flatbush Avenue Clinic to the general public, and did not engage in any other legitimate efforts to obtain patient referrals at the Flatbush Avenue Clinic.

95.     Instead, the Flatbush Avenue Clinic obtained virtually all of its patients through one of two means: referrals from personal injury attorneys or through a network of individuals (the "Runners") who were paid by the Management Defendants for each Insured that they delivered to the Flatbush Avenue Clinic for the medically-unnecessary Fraudulent Services.

96.     The personal injury attorneys referred Insureds to the Flatbush Avenue Clinic, and the Defendants accepted the referrals, without regard for the Insureds' individual presentment, symptoms, or – in many cases – the total absence of any legitimate injuries arising from any automobile accidents.

97.     Rather, the personal injury attorneys made the referrals, and the Defendants accepted referrals, in order to generate income for themselves, not to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

98.     The personal injury attorneys benefitted from the referrals and the Defendants' subsequent purported provision of the Fraudulent Services because the Defendants' phony treatment records falsely represented that the Insureds sustained serious injuries in automobile accidents, and thereby supported the Insureds' personal injury claims.

99.     The Defendants derived significant financial benefit from the relationships with the personal injury attorneys because without the access to the Insureds provided by the referring personal injury attorneys, the Defendants would not have the ability to implement their fraudulent treatment and billing protocol, bill automobile insurers including GEICO, or generate income from insurance claim payments.

100.    Once an Insured was delivered to the Flatbush Avenue Clinic, either by the Runners or pursuant to a referral from a personal injury attorney, either Pavlova, Parisien, Dabiri,

Lacina, or Blackman virtually always would purport to conduct an initial examination of the Insured.

101.   Then, at the direction of the Management Defendants – and in exchange for compensation by the Management Defendants, their de facto employers, either Pavlova, Parisien, Dabiri, Lacina, or Blackman would refer the Insureds on to Mollo, Island Life, Deng, and Masigla for medically-unnecessary chiropractic, acupuncture, and physical therapy services, without regard for the Insureds' individual circumstances or presentment.

102.   The amount of compensation that the Management Defendants paid to Pavlova, Parisien, Dabiri, Lacina, and Blackman generally was based on the volume of Insureds that Pavlova, Parisien, Dabiri, Lacina, and Blackman referred to Mollo, Island Life, Deng, and Masigla, as well as on the volume of Fraudulent Services that Pavlova, Parisien, Dabiri, Lacina, and Blackman themselves purported to provide the Insureds.

103.   Pavlova, Parisien, Dabiri, Lacina, and Blackman referred Insureds to Mollo, Island Life, Deng, and Masigla, and Mollo, Island Life, Deng, and Masigla accepted the referrals, despite their actual knowledge that the Fraudulent Services played no genuine role in the treatment or care of the Insureds.

**2.      The Fraudulent Initial Examinations**

104.   As set forth above, upon presenting at the Flatbush Avenue Clinic, virtually every Insured purportedly received an initial examination from Pavlova, Parisien, Dabiri, Lacina, or Blackman.

105.   The initial examinations were performed as a "gateway" in order to provide Insureds with pre-determined diagnoses to allow the Defendants to then provide the additional

Fraudulent Services, including follow-up examinations, diagnostic testing, pain management injections, chiropractic services, acupuncture services, and physical therapy services.

106.  The initial examinations then were billed to GEICO either through Allay Medical, or under the individual tax identification numbers of Pavlova, Parisien, Dabiri, Lacina, or Blackman (collectively, with the Management Defendants, the "Examination Defendants").

107.  The Examination Defendants virtually always billed the initial examinations to GEICO under CPT codes: (i) 99204, typically resulting in charges of $154.30 or $236.94 or (ii) 99205, typically resulting in a charge of $236.94.

108.  The charges for the initial examinations were fraudulent in that the initial examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' illegal kickback and runner scheme, not to treat or otherwise benefit the Insureds.

109.  Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the extent of the initial examinations.

110.  The use of CPT code 99205 typically requires that the physician spend 60 minutes of face-to-face time with the Insured or the Insured's family.

111.  Along similar lines, the use of CPT code 99204 typically requires that the physician spend at least 45 minutes of face-to-face time with the Insured or the Insured's family.

112.  Though the Examination Defendants routinely billed for the initial examinations under CPT codes 99204 and 99205, no physician associated with the Examination Defendants ever spent 45 minutes of face-to-face time with the Insureds or their families during the initial examinations, much less 60 minutes. Rather, the initial examinations rarely lasted more than 20 minutes, to the extent that they were conducted at all.

113.    In keeping with the fact that the initial examinations rarely lasted at least 45 minutes, much less 60 minutes, the Examination Defendants used boilerplate forms in documenting the initial examinations, setting forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

114.    All that was required to complete the boilerplate forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

115.    These interviews and examinations did not require any physician associated with the Examination Defendants to spend more than 45 minutes of face-to-face time with the Insureds, let alone 60 minutes.

116.    According to the New York Workers' Compensation Fee Schedule (the "Fee Schedule"), the use of CPT codes 99204 and 99205 typically requires that the Insured presented with problems of moderate or moderate-to-high severity.

117.    Though the Examination Defendants routinely billed for the initial examinations under CPT codes 99204 and 99205, the Insureds did not present with problems of moderate severity, let alone moderate-to-high severity, as the result of any automobile accident. Rather, to the extent that the Insureds had any health problems at all as the result of any automobile accidents, the problems almost always were of low severity.

118.    In addition, according to the Fee Schedule, when the Examination Defendants submitted charges for initial examinations under CPT code 99204, they represented that: (i) they

took a "comprehensive" patient history; (ii) they conducted a "comprehensive" physical examination; and (iii) they engaged in medical decision-making of "moderate complexity".

119.    Further, according to the Fee Schedule, when the Examination Defendants submitted charges for initial examinations under CPT code 99205, they represented that: (i) they took a "comprehensive" patient history; (ii) they conducted a "comprehensive" physical examination; and (iii) they engaged in medical decision-making of "high complexity."

**(i)     Misrepresentations Regarding "Comprehensive" Patient Histories**

120.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

121.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

122.    The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)   integumentary (skin and/or breast);

(x)   neurological;

(xi)   psychiatric;

(xii)   endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)   allergic/immunologic.

123.   When the Examination Defendants billed for the initial examinations under CPT codes 99204 or 99205, they falsely represented that a physician associated the Examination Defendants took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations.

124.   In fact, neither Pavlova, Parisien, Dabiri, Lacina, Blackman, nor any other healthcare provider associated with the Examination Defendants ever took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations, because they did not document a review of 10 organ systems unrelated to the history of the patients' present illnesses.

125.   Rather, after purporting to provide the initial examinations, the Examination Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

126.   These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

**(ii)      Misrepresentations Regarding "Comprehensive" Physical Examinations**

127.    Moreover, pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

128.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

129.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

130.   When the Examination Defendants billed for the initial examinations under CPT codes 99204 or 99205, they falsely represented that Pavlova, Parisien, Dabiri, Lacina, Blackman, or another physician associated with the Examination Defendants performed a "comprehensive" patient examination on the Insureds they purported to treat during the initial examinations.

131.   In fact, neither Pavlova, Parisien, Dabiri, Lacina, Blackman, nor any other healthcare provider associated with the Examination Defendants ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

132.   For instance, neither Pavlova, Parisien, Dabiri, Lacina, Blackman, nor any other healthcare provider associated with the Defendants ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

133.   Furthermore, although the Examination Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial examinations, the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)   at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)   the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

**(iii)    Misrepresentations Regarding the Extent of Medical Decision-making**

134.    In addition, when the Examination Defendants submitted charges for initial examinations under CPT code 99205, they represented that Pavlova, Parisien, Dabiri, Lacina, Blackman, or another physician associated with the Examination Defendants engaged in medical decision-making of "high complexity."

135.    Similarly, when the Examination Defendants submitted charges for initial examinations under CPT code 99204, they represented that Pavlova, Parisien, Dabiri, Lacina, Blackman, or another physician associated with the Examination Defendants engaged in medical decision-making of "moderate complexity."

136.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant

29

complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

137.    Though the Examination Defendants routinely falsely represented that their initial examinations involved medical decision-making of "high complexity" (when billed under CPT code 99205) or "moderate complexity" (when billed under CPT code 99204), in actuality the initial examinations did not involve any medical decision-making at all.

138.    First, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Examination Defendants for "treatment" pursuant to the Defendants' illegal kickback scheme, they did not arrive with any medical records. Furthermore, prior to the initial examinations, the Examination Defendants neither requested any medical records from any other providers, nor conducted any diagnostic tests.

139.    Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

140.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants, to the extent that the Defendants provided any such diagnostic procedures or treatment options in the first instance.

141.    In almost every instance, any diagnostic procedures and "treatments" that the Defendants actually provided were limited to a series of medically unnecessary pain management modalities and diagnostic tests, none of which were health- or life-threatening if properly administered.

142. Third, the Examination Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

143. Rather, to the extent that the initial examinations were conducted in the first instance, the Examination Defendants provided a nearly identical, pre-determined "diagnosis" for the Insureds, and prescribed a similar course of treatment for each Insured.

144. Specifically, in almost every instance, during the initial examinations the Insureds did not report any medical problems that legitimately could be traced to an underlying automobile accident.

145. Even so, the Examination Defendants prepared phony initial examination/consultation reports in which they provided boilerplate headache, back pain, muscle pain, sprain/strain, and/or radiculitis diagnoses to virtually every Insured.

146. Based upon these supposed "diagnoses", the Examination Defendants directed Insureds to return several times per week for medically unnecessary follow-up examinations, physical therapy, diagnostic testing, chiropractic testing, acupuncture, and pain management treatments.

147. The putative results of the initial examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that the Defendants purported to perform and then billed to GEICO and other insurers.

**3.      The Fraudulent Follow-Up Examinations**

148. In addition to the fraudulent initial examinations, the Examination Defendants typically purported to subject Insureds to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

31

149.   As with the initial examinations, either Pavlova, Parisien, Dabiri, Lacina, or Blackman typically purported to perform the follow-up examinations, which then were billed to GEICO either through Allay Medical, or under the individual tax identification numbers of Pavlova, Parisien, Dabiri, Lacina, or Blackman.

150.   The Examination Defendants virtually always billed the follow-up examinations to GEICO under CPT codes: (i) 99215, typically resulting in a charge of $148.69; or (ii) 99214, typically resulting in a charge of $92.97.

151.   Like the Examination Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to illegal kickbacks and the fraudulent treatment protocol established by the Defendants.

152.   The charges for the follow-up examinations also were fraudulent in that they misrepresented the extent of the follow-up examinations.

153.   According to the Fee Schedule, the use of CPT codes 99215 or 99214 typically requires that the Insured present with problems of moderate-to-high severity.

154.   Though the Examination Defendants routinely billed for the follow-up examinations under CPT codes 99215 and 99214, the Insureds did not present with problems of moderate-to-high severity. Rather, to the extent that the Insureds had any actual medical problems at all as the result of their generally minor automobile accidents, the problems were of low severity.

155.   Furthermore, the use of CPT code 99215 typically requires that the physician spend 40 minutes of face-to-face time with the Insured or the Insured's family. The use of CPT

code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family.

156.    Though the Examination Defendants routinely billed for the follow-up examinations under CPT codes 99215 and 99214, neither Pavlova, Parisien, Dabiri, Lacina, Blackman, nor any other physician associated with the Defendants ever spent 25 minutes of face-to-face time with the Insureds or their families during the follow-up examinations, much less 40 minutes. Rather, the follow-up examinations rarely lasted more than 10 minutes, to the extent that they were conducted at all.

157.    In keeping with the fact that the follow-up examinations rarely lasted more than 10 minutes, to the extent that they were conducted at all, the Examination Defendants used pre-printed checklist or template forms in conducting the examinations.

158.    The pre-printed checklist and template forms that the Examination Defendants used in conducting the follow-up examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

159.    All that was required to complete the pre-printed checklist and template forms was a brief patient interview and a very brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

160.    These interviews and examinations did not require any physician associated with the Examination Defendants to spend more than 10 minutes of face-to-face time with the Insureds during the putative follow-up examinations.

161.    In addition, when the Examination Defendants submitted charges for the follow-up examinations under CPT code 99215, they falsely represented that Pavlova, Parisien, Dabiri, Lacina, Blackman, or some other physician associated with the Defendants performed at least two of the following three components: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity".

162.    Similarly, when the Examination Defendants submitted charges for the follow-up examinations under CPT code 99214, they falsely represented that Pavlova, Parisien, Dabiri, Lacina, Blackman, or some other physician associated with the Defendants performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

163.    During the purported follow-up examinations, neither Pavlova, Parisien, Dabiri, Lacina, Blackman, nor any other physician associated with the Examination Defendants took a "detailed" patient history, much less a "comprehensive" patient history.

164.    Furthermore, during the purported follow-up examinations, neither Pavlova, Parisien, Dabiri, Lacina, Blackman, nor any other physician associated with the Examination Defendants conducted a "detailed" patient examination, much less a "comprehensive" patient examination.

165.    What is more, during the purported follow-up examinations, neither Pavlova, Parisien, Dabiri, Lacina, Blackman, nor any other physician associated with the Examination Defendants engaged in "moderately complex" medical decision-making, much less medical decision-making of "high complexity".

34

166.   Instead, in most cases the Examination Defendants did not actually provide any follow-up examinations at all, and compiled phony boilerplate "follow-up examination" reports out of whole cloth to support their fraudulent treatment and billing protocol.

167.   Virtually all of the phony "follow-up examination" reports that the Examination Defendants compiled falsely suggested that the Insureds' conditions had improved as the result of the ersatz course of "treatment" that the Defendants purported to provide, but that the Insureds required additional Fraudulent Services in order to complete their recovery.

**4.     The Fraudulent Computerized Range of Motion and Muscle Strength Tests**

168.   In an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, the Defendants purported to subject most Insureds to medically unnecessary computerized range of motion and muscle strength testing ("ROM/MT"), typically at or near the dates on which the Defendants purported to provide the initial examinations and follow-up examinations.

169.   Typically, either Parisien, Dabiri, Lacina, or Blackman purported to perform the ROM/MT, which then were billed to GEICO either through Allay Medical, or under the individual tax identification numbers of Parisien, Dabiri, Lacina, or Blackman (collectively, with Pavlova and the Management Defendants, the "ROM/MT Defendants").

170.   The ROM/MT  Defendants then billed the computerized range of motion tests to GEICO as multiple charges of $45.71 under CPT code 95851, generally for each round of testing.

171.   The ROM/MT Defendants billed the computerized muscle strength tests to GEICO as multiple charges of $43.60 under CPT code 95831 or $114.32 under CPT code 95833, generally for each round of testing.

172.   Like the Defendants' charges for the other Fraudulent Services, the charges for the ROM/MT were fraudulent in that the ROM/MT were medically unnecessary and performed – to the extent that they were performed at all – pursuant to illegal kickbacks and the Defendants' fraudulent treatment protocol.

(i)   **Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength**

173.   The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

174.   The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount of movement at the joint.

175.   A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement at the joint in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the physician asks the patient to move at his or her joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

176.   Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body or extremity in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he or she would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

36

177.    Physical examinations performed on patients with soft-tissue trauma necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

178.    Since range of motion and muscle strength tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the examinations.

179.    In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided range of motion and muscle strength tests.

**(ii)    The ROM/MT Defendants' Duplicate Billing for Medically Unnecessary ROM/MT**

180.    To the extent that the Examination Defendants actually provided the examinations that were billed to GEICO, the Examination Defendants provided manual range of motion tests and manual muscle strength tests to each Insured during each examination.

181.    The charges for the manual range of motion and manual muscle strength tests were part and parcel of the charges that the Examination Defendants routinely submitted for the initial examinations under CPT codes 99204 and 99205, and for the follow-up examinations under CPT codes 99214 and 99215.

182.    Despite the fact that the ROM/MT Defendants knew that the Insureds already purportedly had undergone manual range of motion and muscle testing during their

37

examinations, and despite the fact that the ROM/MT Defendants knew that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the examinations, the ROM/MT Defendants systemically billed for, and purported to provide, ROM/MT to Insureds.

183.   Though the Insureds routinely visited the Flatbush Avenue Clinic several times per month for follow-up examinations and other Fraudulent Services, the ROM/MT Defendants often deliberately scheduled separate appointments for ROM/MT so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations, as required by the Fee Schedule.

184.   The ROM/MT Defendants purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies while the Insured was asked to attempt various motions and movements.  The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each examination, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

185.   The ROM/MT Defendants purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the Insured was asked to press three-to-four separate times using various muscle groups. As with the computerized range of motion tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and follow-up examinations – except that a digital printout was obtained.

186.     The information gained through the use of the ROM/MT was not significantly different from the information obtained through the manual testing that was part and parcel of each Insured's initial and follow-up examinations.   In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was meaningless.

187.     While ROM/MT can be a medically useful tool as part of a research project, under the circumstances employed by the ROM/MT Defendants it represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during virtually every Insured's initial examination and follow-up examinations.

188.     The ROM/MT were part and parcel of the Defendants' interrelated fraudulent schemes, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

**(iii)     The ROM/MT Defendants' Fraudulent Unbundling of Charges for the Computerized Range of Motion and Muscle strength tests**

189.     Not only did the ROM/MT Defendants deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle strength tests, they also unbundled their billing for the tests in order to maximize the fraudulent charges that they could submit to GEICO.

190.     Pursuant to the Fee Schedule, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

39

191.    CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that is performed.  Thus, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71 for the ROM/MT under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 for the ROM/MT under CPT code 97750, resulting in total charges of $91.42, and so forth.

192.    The ROM/MT Defendants purported to provide computerized range of motion and muscle strength tests to Insureds on the same dates of service.

193.    To the extent that the ROM/MT Defendants actually provided the computerized range of motion and muscle strength tests to Insureds in the first instance, the computerized range of motion and muscle strength tests – together – never took more than 15 minutes to perform.  Thus, even if the ROM/MTs that the ROM/MT Defendants purported to provide were medically necessary, and performed in the first instance, the Defendants would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which they performed ROM/MT on an Insured.

194.    In order to maximize their fraudulent billing for the ROM/MT, the ROM/MT Defendants unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges of $43.60 under CPT code 95831 or $114.32 under CPT code 95833 (for the muscle strength tests); and (ii) multiple charges of $45.71 under CPT code 95851 (for the range of motion tests).

195.    By unbundling what should – at most – have been a single $45.71 charge under CPT code 97750 into multiple charges under CPT codes 95831, 95833, and 95851, the

40

ROM/MT Defendants typically inflated the fraudulent ROM/MT charges that they submitted to GEICO by an order of magnitude.

**(iv)     The ROM/MT Defendants' Fraudulent Misrepresentations as to the Existence of Written, Interpretive Reports Regarding the ROM/MT**

196.   Not only were the ROM/MT Defendants' charges for the ROM/MT fraudulent because the tests were medically unnecessary, and because the billing was fraudulently unbundled, but the charges also were fraudulent because they falsely represented that the ROM/MT Defendants prepared written reports interpreting the test data.

197.   Pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT codes 95851 or for computerized muscle testing using CPT codes 95831 or 95833, the provider represents that it has prepared a written report interpreting the data obtained from the test.

198.   Though the ROM/MT Defendants routinely submitted billing for the computerized range of motion and muscle strength tests using CPT codes 95851, 95831, and 95833, the Defendants did not prepare written reports interpreting the data obtained from the tests.

199.   The ROM/MT Defendants did not prepare written reports interpreting the data obtained from the tests because the tests were not meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the tests were provided as part of the Defendants' pre-determined fraudulent treatment protocol, and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

**5.     The Fraudulent Functional Capacity Evaluation Tests**

200.   In addition to other Fraudulent Services, the Defendants purported to provide functional capacity evaluation ("FCE") tests to many Insureds.

41

201.    Like the Defendants' charges for the other Fraudulent Services, the charges for the FCE tests were fraudulent in that the tests were medically unnecessary and performed – to the extent that they were performed at all – pursuant to illegal kickbacks and the Defendants' fraudulent treatment protocol.

202.    Typically, Parisien, Blackman, or Dabiri purported to perform the FCE tests, which then were billed by the Defendants to GEICO either through Allay Medical, or under the individual tax identification numbers of Parisien, Blackman, or Dabiri (collectively, with Pavlova and the Management Defendants, the "FCE Defendants").

203.    The FCE Defendants billed the FCE tests to GEICO under CPT code 97750, generally resulting in charges of between $125.00 and $250.00 for each round of FCE testing that they purported to provide.

**(i)      Legitimate Uses and Requirements for FCE Testing**

204.    An FCE test is a diagnostic test that assesses an individual's physical capacities and functional abilities by matching human performance levels to the demands of a specific occupation or work activity. FCE tests establish the physical level of work an individual can perform and can be useful in determining job placement, job accommodation, or ability to return to work following an injury or illness. FCE tests also can provide objective information regarding functional work ability for use in determination of an individual's occupational disability status.

205.    The Fee Schedule makes clear that FCE tests only should be used to determine an individual's ability to assume or return to work. As the Fee Schedule states:

**Indications**

The FCE is utilized for the following purposes:

42

A)    To determine the level of safe maximal function at the time of maximal medical improvement.

B)    To provide a pre-vocational baseline of functional capabilities to assist in the vocational rehabilitation process.

C)    To objectively set restrictions and guidelines for return to work.

D)    To determine whether specific job tasks can be safely performed by modification or technique, equipment or by further training.

E)    To determine whether additional treatment or referral to a work hardening program is indicated.

F)    To assess outcome at the conclusion of a work hardening program.

206.    The Fee Schedule also places certain limits on – among other things – who may perform an FCE test, and the circumstances under which FCE tests may be performed. Specifically, the Fee Schedule provides that:

(i)    FCE tests only may be performed by: (a) a licensed physical therapist; (b) a licensed occupational therapist; or (c) another licensed healthcare provider qualified by his or her scope of practice, and constant supervision of the FCE test by the licensed provider is required.

(ii)    FCE tests only may be performed only at the point of maximal medical improvement in the opinion of the attending physician.

(iii)    FCE tests may not be prescribed prior to three months post-injury unless there is a significant documented change in the status of the patient which justifies earlier utilization.

(iv)    FCE tests only may be performed where the patient: (a) is preparing to return to a previous job; (b) has been offered a new job; or (c) is working with a rehabilitation provider and a vocational objective is established.

**(ii)    The FCE Defendants' Duplicative Billing for Medically Unnecessary FCE Tests**

207.    The FCE Defendants purported to provide FCE tests to many Insureds despite their actual knowledge that the FCE tests, to the extent that they were performed at all, were medically unnecessary and duplicative of the manual range of motion and muscle strength tests

that they purported to provide during every initial examination/consultation and follow-up examination, and the ROM/MT that they frequently purported to contemporaneously provide.

208.    Much like the duplicative ROM/MT, the only substantive difference between the FCE tests, and the manual range of motion and manual muscle strength tests purportedly provided by the Defendants during every initial examination/consultation and follow-up examination, is that the FCE tests generated a digital printout of an Insured's range of motion and/or muscle strength.

209.    The range of motion and muscle strength data obtained through the use of the FCE tests were not significantly different from the information obtained through the manual testing that was part and parcel of the initial examination/consultation and follow-up examinations purportedly provided by the Defendants to virtually every Insured.

210.    Nor were the range of motion and muscle strength data obtained through the use of the FCE tests significantly different from the data that the Defendants obtained through the ROM/MT they purported to provide to many Insureds.

211.    In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was meaningless. Indeed, this was evidenced by the fact that the Defendants virtually never incorporated the results of the FCE tests into the rehabilitation programs of any of the Insureds that they purported to treat.

**(iii)    The FCE Defendants' Fraudulent Billing for FCE Tests Performed by Unlicensed Technicians**

212.    Though the Fee Schedule requires that FCE tests be performed by: (i) a licensed physical therapist; (ii) a licensed occupational therapist; or (iii) another licensed healthcare

44

provider qualified by his or her scope of practice, the FCE tests allegedly provided by the Defendants were not performed by licensed healthcare providers of any type.

213.    Rather, the FCE tests allegedly provided through the FCE Defendants were performed by unlicensed "technicians", who were not healthcare providers and who were not qualified to maintain any sort of healthcare practice.

214.    The technicians who performed the FCE tests that allegedly were provided through the FCE Defendants were not supervised by Parisien, Blackman, Dabiri, or any other licensed healthcare providers associated with the FCE Defendants. Rather, they were simply directed to appear at the Flatbush Avenue Clinic on designated dates, where they purported to perform the FCE tests in the absence of supervision by Parisien, Blackman, Dabiri, or any other licensed healthcare providers associated with the FCE Defendants.

215.    To conceal the fact that the FCE tests were not performed by licensed healthcare providers, and therefore were unreimburseable under the Fee Schedule, the FCE Defendants routinely falsely represented that a licensed physician was the "treating provider" with respect to the FCE tests in the billing that they submitted, or caused to be submitted, to GEICO.

**(iv)    Performance of the FCE Tests Without Regard for Insureds' Vocational Status**

216.    Although the Fee Schedule provides that FCE tests may only be performed where the Insured: (i) is preparing to return to a previous job; (ii) has been offered a new job; or (iii) is working with a rehabilitation provider and a vocational objective is established, the FCE tests allegedly provided through the FCE Defendants were performed – to the extent that they were performed at all – without regard for the Insureds' vocational status.

217.    Specifically, in virtually every instance where FCE tests purportedly were provided to Insureds through the FCE Defendants, the Insureds either: (i) were unemployed at

the time when the underlying automobile accidents occurred, and therefore had no "previous job" to return to; (ii) lost no time from work as the result of the underlying automobile accidents, and therefore had no "previous job" to return to; (iii) had not been offered any new employment; and/or (iv) had no "vocational objective" against which their functional capacity needed to be measured.

218.    To conceal the fact that the FCE tests were performed without regard for Insureds' vocational status, and therefore were unreimburseable under the Fee Schedule, the FCE Defendants routinely omitted any information regarding the Insureds' vocational status from the FCE test reports that they submitted, or caused to be submitted, in support of their FCE test billing.

**(v)     Performance of FCE Tests Without Regard for Insureds' Medical Improvement**

219.    In keeping with the fact that FCE tests are intended to determine an Insured's ability to commence or return to work, the Fee Schedule provides that FCE tests only may be performed at the point of maximal medical improvement in the opinion of the attending physician.

220.    Because an Insured is unlikely to achieve maximal medical improvement immediately after their accident, the Fee Schedule provides that FCE tests should not be performed prior to three months post-injury unless there is a significant documented change in the status of the patient that justifies earlier utilization.

221.    Because an Insured only can achieve maximal medical improvement from a single accident on a single occasion, FCE tests should be performed only once with respect to any given Insured following any single accident.

222.     Even so, the FCE Defendants routinely purported to provide at least two FCE tests to a single Insured following a single accident, with the first and – in many cases – the second such FCE tests performed less than three months following the respective Insureds' accidents.

223.     The FCE Defendants routinely purported to provide these FCE tests without regard for any Insured's medical improvement.

224.     To conceal the fact that the FCE tests were provided – to the extent that they were provided at all – without regard for Insureds' medical improvement, and therefore were unreimburseable under the Fee Schedule, the FCE Defendants routinely omitted any information regarding the Insureds' recovery status from the FCE test reports that they submitted, or caused to be submitted, in support of their billing.

**(vi)     Concealment of the Nature of the FCE Tests**

225.     Because the FCE Defendants were aware of the Fee Schedule restrictions on FCE tests, and were aware that the FCE tests they purported to provide were unreimburseable, they attempted to conceal the fact that the tests they purported to provide were FCE tests.

226.     Pursuant to the Fee Schedule, the proper CPT code for an FCE test is 97800.

227.     In an attempt to conceal the fact that they were purporting to provide FCE tests, the FCE Defendants generally submitted their charges for the FCE tests under CPT code 97750, rather than under CPT code 97800.

228.     CPT code 97750 is the code used for "physical performance" tests, rather than FCE tests and – unlike FCE tests – physical performance tests are not subject to the Fee Schedule utilization restrictions.

229.   The FCE Defendants' use of CPT code 97750 to bill for the tests they purported to provide deliberately misrepresented the nature of the tests they purported to provide. In fact, the tests that the Defendants billed under CPT code 97750 were FCE tests, and – like any FCE tests – purported to measure the Insureds' functional capacity against vocational/occupational standards.

230.   The FCE Defendants billed for their FCE tests under CPT code 97750 in a calculated attempt to conceal the fact that the tests were unreimburseable under the Fee Schedule.

**(vii)   Fraudulent Inflation of FCE Test Billing**

231.   In the cases where the FCE Defendants attempted to conceal the nature of their test billing by submitting it under CPT code 97750, they also fraudulently inflated their billing and misrepresented the extent of the services that they purported to provide.

232.   As set forth above, CPT code 97750 is a "time-based" code, which in the metropolitan New York area permits a discrete charge of $45.71 for every 15 minutes that a provider spends on a test.

233.   When a healthcare provider submits a charge under CPT code 97750, it represents that it has prepared a written report interpreting the test results.

234.   In virtually every case in which the FCE Defendants submitted a bill for FCE testing under CPT code 97750, they falsely stated that the FCE tests took between 45 minutes and an hour and a half to perform, resulting in typical charges of between approximately $125.00 and $250.00 per test.

235.   In actuality, the FCE tests – to the extent that they were performed at all – never took more than 15 minutes to perform.

48

236.    In virtually every bill for the performance of the FCE tests that the FCE Defendants submitted or cause to be submitted, the FCE Defendants falsely represented that the treating provider prepared a written report interpreting the test results.

237.    In actuality, neither Parisien, Blackman, Dabiri, nor any other physician or healthcare provider associated with the FCE Defendants ever prepared a written report interpreting the FCE test results. The "reports" generated by the FCE Defendants contained no interpretation whatsoever, and consisted of nothing more than the purported raw data from the testing, together with boilerplate explanations of the general nature or purpose of the testing that did not vary from Insured to Insured.

**6.       The Fraudulent "Outcome Assessment Testing"**

238.    In addition to the other Fraudulent Services, the Defendants subjected Insureds to medically useless "outcome assessment tests," generally on the same dates when they purported to subject the Insureds to initial or follow-up examinations.

239.    Generally, either Parisien or Blackman purported to perform the "outcome assessment testing", which the Defendants then billed to GEICO either through Allay Medical, or under Parisien or Blackman's individual tax identification numbers (collectively, with Pavlova and the Management Defendants, the "Outcome Assessment Defendants").

240.    The Outcome Assessment Defendants billed the "outcome assessment tests" to GEICO under CPT code 99358, generally resulting in a charge of $204.41 or $200.00 for each round of "testing."

241.    Like the Defendants' charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and,

even when actually performed, were performed pursuant to illegal kickbacks and the Defendants' fraudulent treatment protocol.

242. The "outcome assessment tests" that the Outcome Assessment Defendants purported to provide Insureds were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact of those symptoms on their lives.

243. Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the "outcome assessment tests" that the Outcome Assessment Defendants purported to provide were nothing more than a questionnaire regarding the Insureds' history and physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the initial examinations and follow-up examinations. In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided "outcome assessment tests."

244. The information gained through the use of the "outcome assessment tests" that the Outcome Assessment Defendants purported to provide was not significantly different from the information that the Defendants purported to obtain during virtually every Insured's initial examination and follow-up examinations.

245. Under the circumstances employed by the Outcome Assessment Defendants, the "outcome assessment tests" represented purposeful and unnecessary duplication of the patient histories and examinations purportedly conducted during the Insured's initial examination and follow-up examinations. The "outcome assessment tests" were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-determined

protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

246.    The Outcome Assessment Defendants' use of CPT code 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that a physician actually spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the patient and his or her family.

247.    Though the Outcome Assessment Defendants routinely submitted billing for the "outcome assessment tests" under CPT code 99358, no physician associated with the Outcome Assessment Defendants spent an hour reviewing or administering the tests or, indeed, any time at all reviewing or administering the tests.

248.    Indeed, the "outcome assessment tests" did not require any physician involvement at all, inasmuch as the "tests" simply were questionnaires that were completed by the Insureds.

249.    Nevertheless, the Outcome Assessment Defendants submitted billing to GEICO for billing under CPT code 99358.

**7.    The Fraudulent Transcutaneous Electrical Nerve Stimulation Sessions**

250.    In addition to the other Fraudulent Services they purported to provide, the Defendants purported to subject many Insureds to a series of medically unnecessary transcutaneous electrical nerve stimulation ("TENS") sessions.

251.    Typically, Lacina, Parisien, Blackman, Dabiri, Pavlova, or Masigla purported to perform the TENS sessions, which the Defendants then billed to GEICO either through Allay Medical, or under the individual tax identification numbers of Lacina, Parisien, Blackman,

51

Dabiri, Pavlova, or Masigla (collectively, with Pavlova and the Management Defendants, the "TENS Defendants").

252. The TENS Defendants billed the purported TENS sessions to GEICO under CPT code 64550, generally resulting in charges of at least $73.30 for each TENS session that they purported to provide.

253. Like the Defendants' charges for the other Fraudulent Services, the charges for the TENS sessions were fraudulent in that the TENS sessions were medically unnecessary and were performed – to the extent that they were performed at all –pursuant to illegal kickbacks and the fraudulent treatment protocol.

**(i)     Legitimate Uses for TENS**

254. In a legitimate clinical setting, TENS is the use of electric current produced by a device to stimulate the nerves for therapeutic purposes.

255. According to guidelines published by the Centers for Medicare & Medicaid Services ("CMS"), TENS does not prevent pain but only alleviates it as it occurs. A patient can be taught how to employ the stimulator device, and once this is done, can use it safely and effectively without direct physician supervision.

256. Consequently, CMS further instructs that it is not medically necessary for a patient to visit his/her physician, physical therapist, or an outpatient clinic on a continuing basis for treatment of pain with TENS devices, and – as a result – outpatient TENS treatments are excluded from Medicare and Medicaid coverage.

**(ii)    The TENS Defendants' Fraudulent TENS Session Charges**

257.    Even so, in order to maximize the fraudulent charges that they could submit, or cause to be submitted, to GEICO, the TENS Defendants routinely instructed Insureds to return for outpatient TENS sessions.

258.    In actuality, however, to the extent that the TENS Defendants provided any electrical stimulation treatments to Insureds in the first instance, the electrical stimulation treatments constituted physical therapy treatments under the Fee Schedule, not TENS sessions.

259.    Pursuant to the Fee Schedule, physical therapy treatments are billable at a much lower rate than TENS Sessions. In the New York metropolitan area electrical stimulation treatments – in particular – are reimbursable at a rate of only $22.47 apiece, to the extent that they are medically necessary in the first instance.

260.    The TENS Defendants deliberately misrepresented the electrical stimulation treatments they purported to provide as TENS sessions in a calculated attempt to overcharge GEICO and other insurers for the electrical stimulation treatments, which they typically billed at $73.30 apiece, or more than three times the permissible amount.

261.    In fact, the TENS sessions that the TENS Defendants purported to provide were medically unnecessary, and the treatments were provided – to the extent that they were provided at all – solely to financially enrich the Defendants, not to benefit the Insureds who were subjected to them.

**8.    The Fraudulent Neurological Consultations and Electrodiagnostic Testing**

262.    Based upon the fraudulent, pre-determined "diagnoses" that the Examination Defendants provided during the initial and follow-up examinations, the Defendants purported to subject many Insureds to medically-unnecessary neurological consultations and a series of

medically unnecessary electromyography ("EMG") tests, nerve conduction velocity ("NCV") tests, somatosensory evoked potential ("SSEP") tests, and voltage nerve conduction threshold ("v-NCT")(collectively "EDX") tests.

263.    Like the Defendants' charges for the other Fraudulent Services, the charges for the neurological consultations and EDX tests were fraudulent in that the consultations and tests were medically unnecessary and performed – to the extent that they were performed at all – pursuant to illegal kickbacks and the Defendants' fraudulent treatment protocol.

**(i)    The Fraudulent Neurological Consultations**

264.    As an initial step in the EDX testing component of the Defendants' fraudulent treatment and billing protocol, Lacina, Parisien, Blackman, or Dabiri purported to provide most Insureds with a neurological consultation, which then was billed to GEICO either through Allay Medical or under the individual tax identification numbers of Lacina, Parisien, Blackman, or Dabiri (collectively, with Pavlova and the Management Defendants, the "Neurological Consultation Defendants").

265.    The Neurological Consultation Defendants virtually always billed the neurological consultations to GEICO under CPT code 99244, typically resulting in charges of $236.94 per Insured.

266.    In addition to being medically unnecessary, the Neurological Consultation Defendants' charges for the neurological consultations were fraudulent because they misrepresented the nature of the underlying service.

267.    According to the Fee Schedule, the use of CPT code 99244 represents that a physician performed a consultation at the request of another physician or other appropriate source.

268.    However, the Neurological Consultation Defendants did not provide their neurological consultations – to the extent that they were provided at all – at the request of any other physicians or other appropriate sources. Rather, to the extent that the neurological consultations were performed in the first instance, they were performed solely as part of the Defendants' fraudulent treatment protocol.

269.    Furthermore, the Neurological Consultation Defendants' use of CPT code 99244 represented that the physicians who purportedly conducted the consultations submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the consultations in the first instance.

270.    Though the Neurological Consultation Defendants routinely billed for the neurological consultations under CPT code 99244, the physicians who purportedly conducted the consultations did not submit any written consultation report to any physician or other referring healthcare provider, because the initial consultations were not conducted at the request of any referring physician or healthcare provider.

271.    Furthermore, the Neurological Consultation Defendants' charges for the neurological consultations were fraudulent in that they misrepresented the extent of the consultations.

272.    According to the Fee Schedule, the use of CPT code 99244 typically requires that the Insured present with problems of moderate-to-high severity.

273.    Though the Neurological Consultation Defendants routinely billed for the neurological consultations under CPT code 99244, the Insureds did not present with problems of moderate-to-high severity or even moderate or low severity.

274.   Furthermore, the use of CPT code 99244 typically requires that the physician who performs the consultation spend 60 minutes of face-to-face time with the Insured or the Insured's family.

275.   Though the Neurological Consultation Defendants routinely billed for the neurological consultations under CPT code 99244, no licensed healthcare provider associated with the Neurological Consultation Defendants ever spent 60 minutes on the neurological consultations. Rather, the neurological consultations rarely lasted more than 15 minutes, to the extent that they were conducted at all.

276.   In addition, according to the Fee Schedule, when the Neurological Consultation Defendants submitted charges for neurological consultations under CPT code 99244, they represented that: (i) they took a "comprehensive" patient history; (ii) they conducted a "comprehensive" physical examination; and (iii) they engaged in medical decision-making of "moderate complexity".

a.   **Misrepresentations Regarding "Comprehensive" Patient Histories**

277.   As set forth above, pursuant to the CPT Assistant, which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

278.   Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

279.   As set forth above, the CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)   constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)  musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)     neurological;

(xi)    psychiatric;

(xii)   endocrine;

(xiii)  hematologic/lymphatic; and

(xiv)   allergic/immunologic.

280.    When the Neurological Consultation Defendants billed for the neurological consultations under CPT code 99244, they falsely represented that a physician associated the Neurological Consultation Defendants took a "comprehensive" patient history from the Insureds they purported to treat during the neurological consultations.

281.    In fact, neither Parisien, Dabiri, Lacina, Blackman, nor any other healthcare provider associated with the Neurological Consultation Defendants ever took a "comprehensive" patient history from the Insureds they purported to treat during the neurological consultations, because they did not document a review of 10 organ systems unrelated to the history of the patients' present illnesses.

282.    Rather, after purporting to provide the neurological consultations, the Neurological Consultation Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

283.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

**b.      Misrepresentations Regarding "Comprehensive" Physical Examinations**

284.    Moreover, and as set forth above, pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

285.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

286.    As set forth above, pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

287.     When the Neurological Consultation Defendants billed for the neurological consultations under CPT code 99244, they falsely represented that Parisien, Dabiri, Lacina, Blackman, or another physician associated with the Neurological Consultations Defendants performed a "comprehensive" patient examination on the Insureds they purported to treat during the neurological consultations.

288.     In fact, neither Parisien, Dabiri, Lacina, Blackman, nor any other healthcare provider associated with the Neurological Consultations Defendants ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

289.     For instance, neither Parisien, Dabiri, Lacina, Blackman, nor any other healthcare provider associated with the Neurological Consultation Defendants ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

290.    Furthermore, although the Neurological Consultation Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative neurological consultations, the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

**c.    Misrepresentations Regarding the Extent of Medical Decision-making**

291.    In addition, when the Neurological Consultations Defendants submitted charges for neurological consultations under CPT code 99244, they represented that Parisien, Dabiri, Lacina, Blackman, or another physician associated with the Neurological Consultation Defendants engaged in medical decision-making of "moderate complexity."

292.     As set forth above, pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

293.     Though the Neurological Consultation Defendants routinely falsely represented that their neurological consultations involved medical decision-making of "moderate complexity", in actuality the neurological consultations did not involve any medical decision-making at all.

294.     First, the neurological consultations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Neurological Consultation Defendants for "treatment" pursuant to the Defendants' illegal kickback scheme, they did not arrive with any medical records. Furthermore, prior to the neurological consultations, the Neurological Consultation Defendants neither requested any medical records from any other providers, nor conducted any legitimate diagnostic tests.

295.     Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

296.     Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants, to the

extent that the Defendants provided any such diagnostic procedures or treatment options in the first instance.

297.    In almost every instance, any diagnostic procedures and "treatments" that the Defendants actually provided were limited to a series of medically unnecessary pain management modalities and diagnostic tests, none of which were health- or life-threatening if properly administered.

298.    Third, the Neurological Consultation Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the neurological consultations.

299.    Rather, to the extent that the neurological consultations were conducted in the first instance, the Neurological Consultation Defendants provided a nearly identical, pre-determined "diagnosis" for the Insureds, and prescribed a similar course of treatment for each Insured.

300.    Specifically, in almost every instance, during the neurological consultations the Insureds did not report any medical problems that legitimately could be traced to an underlying automobile accident.

301.    Even so, the Neurological Consultation Defendants prepared phony neurological consultation/consultation reports in which they reiterated the boilerplate headache, back pain, muscle pain, sprain/strain, and/or radiculitis diagnoses that previously had been provided to the Insureds.

302.    Based upon these supposed "diagnoses", the Neurological Consultation Defendants recommended that virtually every Insured who purportedly received a neurological consultation also receive EDX testing.

303.     The putative results of the neurological consultations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that the Defendants purported to perform and then billed to GEICO and other insurers.

**(ii)      The Human Nervous System and Electrodiagnostic Testing**

304.     The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, extending through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

305.     The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, to and from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

306.     The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, atrophy, loss of muscle control, and alteration of reflexes.

307.    EMG tests, NCV tests, SSEP tests, and v-NCT tests are forms of electrodiagnostic tests, and purportedly were provided to Insureds at the Flatbush Avenue Clinic because they were medically necessary to determine whether the Insureds had radiculopathies.

308.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

309.    The Recommended Policy accurately reflects the demonstrated utility of certain forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

310.    According to the Recommended Policy, both NCV tests and EMG tests normally must be performed together in order to provide a clinical diagnosis of peripheral nervous system disorders, including radiculopathies. As the Recommended Policy states:

> Radiculopathies cannot be diagnosed by NCS [Nerve Conduction Studies] alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by one physician supervising and/or performing all aspects of the study.
> …
>
> The EDX laboratory must have the ability to perform needle EMGs. NCSs should not be performed without needle EMG except in unique circumstances."

311.    The Recommended Policy does not identify SSEP tests as having any documented usefulness in diagnosing radiculopathies or plexopathies and the medical literature uniformly supports this position.

312.   The Recommended Policy does not identify v-NCT tests as having any documented usefulness in diagnosis radiculopathies or plexopathies.  In fact, v-NCT tests are not recognized as having any value in the diagnosis of any medical condition.

**(iii)    The Fraudulent NCV Tests**

313.   Pursuant to the phony neurological consultations that the Neurological Consultation Defendants purported to provide, many Insureds supposedly received NCV tests.

314.   Typically, Lacina, Parisien, Blackman, or Dabiri purported to perform the NCV tests, which the Defendants then billed to GEICO either through Allay Medical, or under the individual tax identification numbers of Lacina, Parisien, Blackman, or Dabiri (collectively, with Pavlova and the Management Defendants, the "NCV-EMG Defendants").

315.   NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

316.   In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

317.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

318.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

319.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permits healthcare professionals in the metropolitan New York area to submit maximum charges of: (i) $106.47 under CPT code 95904 for each sensory nerve in any limb on which an NCV test is performed; (ii) $166.47 under CPT code 95903 for each motor nerve in any limb on which an NCV test is performed; and (iii) $119.99 under CPT code 95934 for each H-Reflex test that is performed on the nerves of any limb.

320.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

321.    In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the NCV-EMG Defendants routinely purported to test far more nerves than recommended by the Recommended Policy. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the NCV-EMG Defendants routinely

purported to perform and/or provide: (i) NCV tests of eight motor nerves; (ii) NCV tests of 10 sensory nerves; (iii) multiple F-wave studies; and (iv) multiple H-reflex studies.

322.   In many cases, the NCV-EMG Defendants attempted to conceal the fact that they were testing far more nerves than was medically necessary, by splitting their NCV testing onto two separate bills on two separate dates of service.

323.   The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

324.   In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

325.   This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

326.   This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

327.   The NCV-EMG Defendants did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

328.   Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in virtually all of the NCV claims they submitted to GEICO.

329.    In particular, the NCV-EMG Defendants purported to test some combination of the following peripheral nerves and nerve fibers – and, in many cases, all of them – in virtually all of the NCV test claims they submitted to GEICO:

(i)      left and right median motor nerves;

(ii)     left and right ulnar motor nerves;

(iii)    left and right peroneal motor nerves;

(iv)     left and right tibial motor nerves;

(v)      left and right superficial peroneal sensory nerves;

(vi)     left and right sural sensory nerves;

(vii)    left and right median sensory nerves;

(viii)   left and right radial sensory nerves; and

(ix)     left and right ulnar sensory nerves.

330.    The cookie-cutter approach to the NCVs that the NCV-EMG Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCVs was designed solely to maximize the charges that the Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

331.    In keeping with the fact that the NCV tests that the NCV-EMG Defendants purported to provide were medically useless for their supposed purpose – i.e., the diagnosis of radiculopathies – the NCV-EMG Defendants frequently failed to provide EMG tests together with the NCV tests, which rendered the NCV tests medically useless, as an NCV test alone cannot confirm a radiculopathy diagnosis.

(iv)   **The Fraudulent EMG Tests**

332.   In some cases, however, the NCV-EMG Defendants did purport to provide EMG tests to the Insureds.

333.   EMG tests involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the nerve roots, peripheral nerves, and muscles.

334.   Though, in some cases, the NCV-EMG Defendants purported to provide EMG tests to Insureds in order to determine whether the Insureds suffered from radiculopathies, virtually none of the Insureds actually presented with any radiculopathy symptoms or any other medical problems arising from any automobile accidents.

335.   In actuality, to the extent that the NCV-EMG Defendants purported to provide EMG tests to Insureds at all, the tests were provided as part of the Defendants' pre-determined, fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

336.   There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances.

337.   In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

338. The NCV-EMG Defendants did not tailor the EMG tests they purported to provide to the unique circumstances of each Insured. Instead, they routinely purported to test the same muscles in the same limbs over and over again, without regard for individual patient presentment.

339. Furthermore, even if there were any need for any of the EMG tests, the nature and number of the EMG tests that the NCV-EMG Defendants purported to provide frequently grossly exceeded the maximum number of such tests that should be necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

340. Specifically, pursuant to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

341. To the extent that they performed any EMGs in the first instance, the NCV-EMG Defendants generally purported to provide EMGs of four limbs, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO and other insurers.

342. More specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed physicians in the metropolitan New York area to submit maximum EMG charges of: (i) $185.73 under CPT code 95860 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 under CPT code 95861 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 under CPT code 95863 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $408.64 under CPT code 95864 if an EMG is performed on at least five muscles in each of four limbs.

343.    To the extent that the NCV-EMG Defendants provided any EMGs to Insureds at all, the NCV-EMG Defendants routinely purported to provide four-limb EMGs solely to maximize the profits that they can reap from each such Insured.

344.    In many cases, the NCV-EMG Defendants attempted to conceal the fact that they were purporting to provide far more EMG tests than was medically necessary, by splitting their four-limb EMG testing into two separate two-limb EMG bills on two separate dates of service.

345.    Not only did this serve to conceal the fact that the NCV-EMG Defendants were purporting to provide far more EMG tests than was medically necessary, it also increased their EMG billing through fraudulent unbundling of the EMG charges.

346.    As set forth above, the maximum permissible charge for a two-limb EMG is $241.50, and the maximum permissible charge for a four-limb EMG is $408.64.

347.    By routinely submitting two separate two-limb EMG charges of $241.50, rather than a single four-limb EMG charge of $408.64, the NCV-EMG Defendants increased their fraudulent billing for their EMGs by more than $74.00 per EMG.

**(v)    The Fraudulent SSEP Tests**

348.    The NCV-EMG Defendants, as well as Mollo and Island Life (collectively the "SSEP Defendants"), also frequently purported to provide SSEP tests to Insureds as part of their fraudulent treatment and billing protocol.

349.    SSEP tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents. The potentials – wave forms – evoked by this electrical stimulation then are recorded by electrodes overlying the spine and attached to the scalp.

350.    SSEP tests are medically necessary only in limited instances in which an individual suffers from severe spinal impairment, and – in such cases – solely for the purpose of

71

determining where within the spinal canal the patient requires decompression surgery, or as an intra-operative guide during the course of scoliosis surgery upon children, and spine surgery that might comprise the spinal cord. SSEP tests also are considered medically necessary in the diagnosis of suspected multiple scoliosis.

351.    The Recommended Policy does not recommend SSEP tests for use in diagnosing radiculopathies. Consistent with the Recommended Policy, the Medicare guidelines promulgated by the United States Department of Health and Human Services also establish that SSEP tests are not useful in diagnosing radiculopathies.

352.    Even so, the SSEP Defendants frequently purported to provide SSEP tests to Insureds, supposedly to diagnose radiculopathies.

353.    The SSEP Defendants then billed the SSEP tests to GEICO under CPT codes 92925, 95926, and 95927, typically resulting in charges of more than $600.00 for each Insured on whom the SSEP tests purportedly were performed.

354.    Even if the SSEP Defendants' SSEP tests had any medical usefulness in diagnosing radiculopathies, they were medically unnecessary in that they were duplicative of the NCV tests and EMG tests that the NCV-EMG Defendants virtually always purported to provide contemporaneously with the SSEPs.

355.    NCV tests and EMG tests, standing alone, provide a more than sufficient basis for a radiculopathy diagnosis, assuming that they are validly performed.

356.    Even so, the SSEP Defendants virtually always purported to provide SSEP tests to the Insureds at or near the time when the NCV-EMG Defendants purported to provide EMG tests and/or NCV tests to the Insureds.

357.   Under the circumstances in which they were employed by the SSEP Defendants, the purported SSEP tests constituted a purposeful and unnecessary duplication of the NCV tests and EMG tests that the NCV-EMG Defendants purported to conduct in tandem with the SSEP tests.

358.   The SSEP tests were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-determined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

359.   Even if SSEP tests had any clinical utility in diagnosing radiculopathies – which they do not – the decision whether to use them to test the nerves running from the arms or legs to the brain should be tailored to each patient's unique circumstances. As a result, the type of SSEP tests performed should vary from patient-to-patient.

360.   However, the SSEP Defendants did not tailor the SSEP tests that they purported to provide to the unique circumstances of any Insured.  Instead, they routinely purported to provide identical SSEP tests to the Insureds, without regard for the Insureds' individual circumstances or presentment.

**(vi)   The Fraudulent v-NCT Tests**

361.   Mollo and Island Life (collectively, with the Management Defendants, the "v-NCT Defendants"), also frequently purported to provide v-NCT tests to Insureds as part of the Defendants' fraudulent treatment and billing protocol.

362.   The v-NCT Defendants then billed the v-NCT tests to GEICO as multiple charges under CPT code 95999, generally resulting in charges between $1,022.00 and $1,314.00, for each Insured on whom the v-NCT testing purportedly was performed.

a.   **Legitimate Tools for Neuropathy Diagnosis**

363.   The v-NCT Defendants supposedly provided the v-NCT tests to Insureds in order to diagnose neuropathies, or abnormalities in the Insureds' peripheral nerves and nerve roots.

364.   There are three primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent and specific location of abnormalities (i.e., neuropathies) in the peripheral nerves and nerve roots. These diagnostic tests are NCV tests, EMG tests, and magnetic resonance imaging tests ("MRIs").

365.   Except in very limited circumstances, for diagnostic purposes NCVs and EMGs are performed together if: (i) nerve damage is suspected following an auto accident; (ii) the damage cannot be fully evaluated through a physical examination or other generally accepted diagnostic technique; and (iii) the tests are necessary to determine an appropriate treatment plan.

366.   If NCVs and EMGs are necessary to diagnose nerve damage, they should be performed no fewer than 14-21 days following an auto accident because it typically takes at least that long for nerve damage to appear following a trauma.

367.   MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and nerves inside the human body. MRIs often are used following auto accidents to diagnose abnormalities in the peripheral nerves and nerve roots through images of the nerves, nerve roots and surrounding areas.

b.   **The Medically Useless v-NCT Tests**

368.   The v-NCT test is a type of non-invasive sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots. It does

not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

369.   The v-NCT tests are performed by administering electricity through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and/or face. The voltage amplitude is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage. "Findings" then are made by comparing the minimum voltage stimulus required for the patient to announce that he or she perceives some sensation from it with purported normal ranges.

370.   In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in v-NCT testing.

371.   If the patient's sensation threshold is greater than the purported normal range of amplitude required to evoke a sensation, it allegedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function). If the amplitude required for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it allegedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

372.   The sensory nerves are comprised of three different kinds of nerve fibers, the A-beta fibers, the A-delta fibers and the C fibers. The v-NCT tests allegedly can diagnose the existence, nature, extent and location of any abnormal condition in each of these specific nerve fibers by using three different frequencies of electrical current. Specifically, the use of electrical currents with frequencies of 5 Hz, 250 Hz and 2000 Hz allegedly stimulate and thereby test the C fibers, the A-delta fibers and the A-beta fibers, respectively.

75

373.    Though the v-NCT Defendants purported to subject Insureds to v-NCT tests, supposedly to diagnose neuropathies, the v-NCT tests were medically useless because Insureds who purportedly were subjected to the v-NCT tests by the v-NCT Defendants also received, at or about the same time, NCVs, EMGs, and/or MRIs.

374.    Even if the v-NCT tests purportedly provided by the v-NCT Defendants had any legitimate value in the diagnosis of neuropathies, they were duplicative of the NCV tests, EMG tests, and MRIs that the Insureds received and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the v-NCT tests that the v-NCT Defendants purported to provide.

375.    The supposed primary benefit of the v-NCT tests is that they allegedly can diagnose abnormalities in the sensory nerves less than 14-21 days following an accident, which is sooner than NCV tests and EMG tests can be used to effectively diagnose nerve damage following an accident.

376.    However, the v-NCT Defendants routinely purported to provide v-NCT tests to Insureds after the NCV-EMG Defendants purported to provide NCV test and EMG tests to those same Insureds, or contemporaneously with the NCV tests and EMG tests they purported to provide to the Insureds.

377.    Under the circumstances in which they were employed by the v-NCT Defendants, the purported v-NCT tests constituted a purposeful and unnecessary duplication of the NCV tests and EMG tests that the Insureds supposedly received before the v-NCT tests.

378.    Even assuming that there was some diagnostic value for v-NCT tests, the v-NCT tests in these circumstances could not possibly have provided any diagnostic information of any value beyond that which was produced through NCVs, EMGs and/or MRIs.

379.    In any case, there are no legitimate data to support the use of v-NCT tests to diagnose neuropathies in general or radiculopathies in particular.

380.    There is no reliable evidence of the existence of normal ranges of intensity or amplitude required to evoke a sensation using a v-NCT test device. Given the lack of evidence of normal ranges of intensity required to evoke a sensation, it is impossible to determine whether any given Insured's personal v-NCT test results are or are not abnormal.

381.    Even if there was some evidence of the existence of normal ranges of intensity required to evoke a sensation using a v-NCT test device, there is no reliable evidence to prove that a sensation threshold greater than the normal range would indicate a hypoesthetic condition or that sensation threshold less than the normal range would indicate a hyperesthetic condition.

382.    Even if an abnormal sensation threshold indicated either a hypoesthetic or hyperesthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from v-NCT tests. Indeed, there are numerous pathological and physiological conditions other than peripheral nerve damage that can cause hyperesthesia and hypoesthesia.

383.    Furthermore, even if v-NCT tests could produce any valid diagnostic information regarding the sensory nerve fibers:

(i)     there is no reliable evidence to prove that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;

(ii)    there is no reliable evidence to prove that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;

(iii)   there is no reliable evidence to prove that any such information would indicate the specific location of the abnormality along the sensory nerve pathways;

(iv)    v-NCT tests do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident; and

(v)    there would be no legitimate diagnostic advantage to using v-NCT tests to obtain information regarding the sensory nerve fibers where, as here, the v-NCT tests were duplicative of contemporaneously-provided NCV tests, EMG tests, and MRIs.

384.    In keeping with the fact that the v-NCT Defendants' purported v-NCT tests were medically useless, the Centers for Medicare & Medicaid Services ("CMS") have determined that v-NCT tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and radiculopathies and are therefore not compensable.

385.    In keeping with the fact that the v-NCT Defendants' putative v-NCT tests were medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for v-NCT tests.

**c.    Each of the Two Main v-NCT Test Device Manufacturers Claims the Other is a Fraud**

386.    Until 2004, about the same time that CMS was considering the medical benefits of v-NCT testing before ultimately issuing its National Coverage Determination that denied Medicare coverage of v-NCT tests, the two primary manufacturers of sensory nerve conduction threshold devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

387.    Neurotron, Inc. manufactured a device called the "Neurometer". Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000". While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purported to provide quantitative data on sensory nerve conduction threshold.

78

388.    In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II".

389.    Neuro Diagnostic Associates, Inc.'s last known business address and telephone number is identical to that currently used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II.

390.    To the extent that the v-NCT Defendants actually provided any v-NCT tests to Insureds in the first instance, they were provided using an Axon-II or re-branded Medi-Dx 7000 device.

391.    Notwithstanding the Medi-Dx 7000's cosmetic re-branding as the Axon-II, Neurotron, Inc. claims that neither device produces valid data or results, and that both the Medi-Dx 7000 and Axon-II have been fraudulently marketed. For its part, Neuro Diagnostic Associates, Inc. had asserted the same claims regarding Neurotron, Inc.'s Neurometer device.

392.    Among the charges made by Neurotron, Inc. against the Medi-Dx 7000 are that: (i) there is no reliable evidence that the type of electrical wave forms (asymmetrical wave forms) used by the Medi DX 7000 stimulate or provide any useful diagnostic information regarding any specific kind of sensory nerve fiber; (ii) the alternating output of electrical current used by the Medi-Dx 7000 is "severely distorted by skin impedance" (e.g., texture, thickness, temperature of the skin etc.) making it "impossible" to determine the true intensity levels of the electrical current being delivered by the Medi-Dx 7000; (iii) the Medi-Dx 7000 protocols are "incapable of measuring the thresholds in the sensory nerves"; and (iv) there are no peer-reviewed studies that validate the tests performed using the Medi-Dx 7000.

393.   Because the Axon-II is virtually identical to the Medi-Dx 7000, any and all of Neurotron, Inc.'s criticisms of the Medi-Dx 7000 also apply to the Axon-II/Medi-DX 7000.

**d.   The v-NCT Defendants' Fraudulent v-NCT Test "Reports"**

394.   In support of their fraudulent charges for the v-NCT tests,   thev-NCT Defendants submitted phony v-NCT test "reports" which falsely represented that an actual chiropractor had some role in performing and interpreting the tests.

395.   The v-NCT Defendants' bills for the v-NCT tests likewise falsely represented that an actual chiropractor had some role in performing and interpreting the tests.

396.   In actuality, to the extent that the v-NCT tests were performed in the first instance, they were performed by unlicensed technicians, and neither Mollo, nor any other licensed healthcare provider associated with Island Life or the Flatbush Avenue Clinic, had any role whatsoever in interpreting the test results.

397.   In keeping with the fact that the v-NCT tests were performed – to the extent that they were performed at all – by unlicensed technicians, rather than by a licensed chiropractor associated with Mollo or Island Life, the putative test "reports" did not contain any genuine interpretation of the test data.

398.   Instead, aside from reporting the putative v-NCT data that supposedly were derived from the respective Insureds' tests, the boilerplate v-NCT test "reports" each contained identical, boilerplate diagnostic and interpretative sections that did not vary from patient-to-patient and were included solely to foster the illusion that a licensed healthcare professional had some role in performing or interpreting the tests.

399.   The v-NCT Defendants billed for the v-NCT tests as if they were provided by licensed healthcare providers, rather than by the unlicensed technicians, to make it appear as if

80

the services were eligible for reimbursement. The v-NCT Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**(vii)    The Fraudulent "Radiculopathy" Diagnoses**

400.    Radiculopathies – a form of neuropathy – are relatively rare in motor vehicle accident victims, occurring in – at most – 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in <u>Muscle & Nerve</u>, the official journal of the AANEM.

401.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom the Defendants purportedly treated.

402.    As a result, the frequency of radiculopathy in <u>all</u> motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be significantly lower than 19 percent.

403.    Virtually none of the Insureds whom the Defendants purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathy.

404.    Even so, the Neurological Consultation Defendants, NCV-EMG Defendants, SSEP Defendants, and v-NCT Defendants falsely purported to diagnose radiculopathies in the substantial majority of the Insureds that purportedly received EDX testing from the Defendants.

405.   The Neurological Consultation Defendants, NCV-EMG Defendants, SSEP Defendants, and v-NCT Defendants purported to arrive at their pre-determined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the medically unnecessary Fraudulent Services provided through the Defendants.

9.     **The Fraudulent Charges for Trigger Point Injections**

406.   In addition to the other Fraudulent Services they purported to provide, Lacina, Parisien, Blackman, Dabiri, Pavlova, and Allay Medical (collectively, with the Management Defendants, the "Injection Defendants") purported to subject many Insureds to a series of medically unnecessary trigger point injections.

407.   The sole purpose of these medically unnecessary injections was to enrich the Defendants as the injections were performed regardless of the Insureds' symptoms or complaints.

408.   The Injection Defendants then billed the trigger point injections to GEICO under CPT code 20553, generally resulting in charges of $119.10 for each round of trigger point injections that they purported to provide.

409.   Like the Injection Defendants' charges for the other Fraudulent Services, the charges for the trigger point injections were fraudulent in that the trigger point injections were medically unnecessary and were performed – to the extent they were performed at all – pursuant to illegal kickbacks and the fraudulent treatment protocol established by the Defendants.

(i)     **Legitimate Use of Trigger Point Injections**

410.   Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than

82

that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

411.    Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

412.    Any legitimate trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

413.    In a legitimate trigger point treatment, trigger point injections should not be administered until a patient has pain symptoms that have persisted for more than three months and has failed or been intolerant of conservative therapies for at least one month.

414.    In a legitimate trigger point treatment, trigger point injections should not be administered more than once every two months, or more than six times in any given year. This is because: (i) properly administered trigger point injections should provide pain relief lasting for at least two months; and (ii) if a patient's pain is not relieved through the injections, the pain may be caused by something other than a trigger point, and the perpetuating factors of the pain must be identified and managed.

(ii)    **The Injection Defendants' Medically Unnecessary Trigger Point Injections**

415.    The Injection Defendants typically did not wait until any Insured failed conservative therapies before purporting to provide trigger point injections, because conservative therapy is not sufficiently remunerative.

416.    Instead, the Injection Defendants frequently purported to provide trigger point injections to Insureds within the first month or two – and often within days – after the Insureds'

83

automobile accidents, before the Insureds could have had pain symptoms that persisted for more than three months and before the Insureds could have failed or been intolerant of conservative therapies for at least one month. For instance:

(i)      On January 5, 2015, an Insured named "JC" was involved in an automobile accident. Though "JC" could not have experienced persistent pain symptoms or failed conservative therapy only 10 days after his automobile accident, Lacina and the Management Defendants nonetheless purported to provide trigger point injections to "JC" on January 15, 2015, which they billed to GEICO.

(ii)     On January 6, 2015, an Insured named "RJ" was involved in an automobile accident. Though "RJ" could not have experienced persistent pain symptoms or failed conservative therapy only a week after his automobile accident, Lacina and the Management Defendants nonetheless purported to provide trigger point injections to "RJ" on January 13, 2015, which they billed to GEICO.

(iii)    On January 5, 2015, an Insured named "KM" was involved in an automobile accident. Though "KM" could not have experienced persistent pain symptoms or failed conservative therapy less than two weeks after his automobile accident, Lacina and the Management Defendants nonetheless purported to provide trigger point injections to "KM" on January 16, 2015, which they billed to GEICO.

(iv)    On February 1, 2015, an Insured named "CH" was involved in an automobile accident. Though "CH" could not have experienced persistent pain symptoms or failed conservative therapy less than three weeks after her automobile accident, Parisien and the Management Defendants nonetheless purported to provide trigger point injections to "CH" on February 19, 2015, which they billed to GEICO.

(v)     On February 26, 2015, an Insured named "JM" was involved in an automobile accident. Though "JM" could not have experienced persistent pain symptoms or failed conservative therapy only a week after his automobile accident, Parisien and the Management Defendants nonetheless purported to provide trigger point injections to "JM" on March 3, 2015, which they billed to GEICO.

(vi)    On February 15 2015, an Insured named "JR" was involved in an automobile accident. Though "JR" could not have experienced persistent pain symptoms or failed conservative therapy less than 10 days after his automobile accident, Parisien and the Management Defendants nonetheless purported to provide trigger point injections to "JR" on February 24, 2015, which they billed to GEICO.

(vii)   On February 14, 2015, an Insured named "CS" was involved in an automobile accident. Though "CS" could not have experienced persistent pain symptoms or failed conservative therapy less than five days after his automobile accident,

Parisien and the Management Defendants nonetheless purported to provide trigger point injections to "CS" on February 18, 2015, which they billed to GEICO.

(viii)   On October 27, 2014, an Insured named "EB" was involved in an automobile accident. Though "EB" could not have experienced persistent pain symptoms or failed conservative therapy less than 10 days after her automobile accident, Blackman and the Management Defendants nonetheless purported to provide trigger point injections to "EB" on November 6, 2014, which they billed to GEICO.

(ix)   On October 14, 2014, an Insured named "FB" was involved in an automobile accident. Though "FB" could not have experienced persistent pain symptoms or failed conservative therapy only 10 days after his automobile accident, Blackman and the Management Defendants nonetheless purported to provide trigger point injections to "FB" on October 24, 2014, which they billed to GEICO.

(x)   On September 17, 2014, an Insured named "PJ" was involved in an automobile accident. Though "PJ" could not have experienced persistent pain symptoms or failed conservative therapy less than 10 days after her automobile accident, Blackman and the Management Defendants nonetheless purported to provide trigger point injections to "PJ" on September 25, 2014, which they billed to GEICO.

(xi)   On December 10, 2014, an Insured named "CL" was involved in an automobile accident. Though "CL" could not have experienced persistent pain symptoms or failed conservative therapy less than one day after her automobile accident, Blackman and the Management Defendants nonetheless purported to provide trigger point injections to "CL" on December 11, 2014, which they billed to GEICO.

(xii)   On August 30, 2013, an Insured named "DB" was involved in an automobile accident. Though "DB" could not have experienced persistent pain symptoms or failed conservative therapy less than one week after his automobile accident, Pavlova and the Management Defendants nonetheless purported to provide trigger point injections to "DB" on September 3, 2013, which they billed to GEICO.

(xiii)   On December 17, 2013, an Insured named "MH" was involved in an automobile accident. Though "MH" could not have experienced persistent pain symptoms or failed conservative therapy less than one week after her automobile accident, Pavlova and the Management Defendants nonetheless purported to provide trigger point injections to "MH" on December 23, 2013, which they billed to GEICO.

(xiv)   On September 3, 2013, an Insured named "CA" was involved in an automobile accident. Though "CA" could not have experienced persistent pain symptoms or failed conservative therapy less than four days after his automobile accident,

Pavlova and the Management Defendants nonetheless purported to provide trigger point injections to "CA" on September 6, 2013, which they billed to GEICO.

(xv)     On February 24, 2014, an Insured named "VD" was involved in an automobile accident. Though "VD" could not have experienced persistent pain symptoms or failed conservative therapy less than 10 days after his automobile accident, Dabiri and the Management Defendants nonetheless purported to provide trigger point injections to "VD" on March 3, 2014, which they billed to GEICO.

(xvi)    On April 11, 2014, an Insured named "HF" was involved in an automobile accident. Though "HF" could not have experienced persistent pain symptoms or failed conservative therapy less than three weeks after her automobile accident, Dabiri and the Management Defendants nonetheless purported to provide trigger point injections to "HF" on April 28, 2014, which they billed to GEICO.

(xvii)   On January 1, 2014, an Insured named "JL" was involved in an automobile accident. Though "JL" could not have experienced persistent pain symptoms or failed conservative therapy less than one week after his automobile accident, Pavlova and the Management Defendants nonetheless purported to provide trigger point injections to "JL" on January 6, 2014, which they billed to GEICO.

417.     To further increase the fraudulent billing that they submitted for a medically-unnecessary trigger point session, the Injection Defendants routinely submitted a separate charge of $262.91, under CPT code 76942, for "ultrasound guidance" of the trigger point injections.

418.     The charges for "ultrasound guidance" of the injections were fraudulent inasmuch as, like the underlying trigger point injection itself, the ultrasound guidance was not medically necessary and was performed – to the extent that it was performed at all – pursuant to a pre-determined fraudulent protocol designed to maximize the Defendants' billing rather than to treat the Insureds who supposedly were subjected to it.

419.     To further increase the fraudulent billing that they submitted for each medically-unnecessary trigger point session, the Injection Defendants also submitted separate charges for thousands of dollars under CPT code 20999, purportedly for "dry needling", on the same day the Insureds received trigger point injections.

420.    Dry needling is a technique in which a thin filiform needle is used to penetrate the skin and stimulate underlying myofascial trigger points, muscular, and connective tissues.  The technique is used to treat dysfunctions in skeletal muscle, fascia, and connective tissue, diminish persistent peripheral nociceptive input, and reduce or restore impairments of body structure and function.

421.    The charges for "dry needing" were fraudulent inasmuch as, like the underlying trigger point injection itself, the "dry needling" was not medically necessary and was performed – to the extent that it was performed at all – pursuant to a pre-determined fraudulent protocol designed to maximize the Defendants' billing rather than to treat the Insureds who supposedly were subjected to it.

422.    The Injection Defendants purported to subject Insureds to trigger point injections despite the fact that Insureds did not suffer any continuing injuries as the result of the relatively minor automobile accidents they claimed to experience, much less any trigger points.

**10.    The Fraudulent Acupuncture Treatment**

423.    In addition to the other Fraudulent Services that the Defendants purported to provide, Deng and the Management Defendants (collectively the "Acupuncture Defendants") purported to subject many Insureds to a series of medically unnecessary acupuncture treatments.

424.    Like the Defendants' charges for the other Fraudulent Services, the charges for acupuncture were fraudulent in that the acupuncture was medically unnecessary and was performed – to the extent it weas performed at all – pursuant to illegal kickbacks and the fraudulent treatment protocol established by the Defendants.

(i)      **Legitimate Acupuncture Practices**

425.     Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows. Every individual has a unique energy flow ("Chi"). When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

426.     The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity.

427.     The first step in any legitimate acupuncture treatment is a physical examination of the patient. The two most critical components of this examination are the appearance of the patient's tongue (i.e., color, shape, texture, etc.) and various measurements of the patient's pulse (i.e., rate, rhythm, strength, etc.). The information gleaned from these elements of the physical examination is necessary to diagnose the patient's condition and thereby develop an acupuncture treatment plan designed to benefit the patient by restoring his unique Chi.  In cases involving trauma, an actual physical examination also is appropriate to identify the location of the injury and consequent pain and – by extension – to identify the Meridians, if any, that have been disrupted.

428.     The second step in any legitimate acupuncture treatment is the development of an acupuncture treatment plan. In developing a legitimate treatment plan, an acupuncturist will consider both the injuries sustained by the patient, as well as the tongue and pulse information obtained during the physical examination. Using this information, the acupuncturist will identify

88

  
a unique, cohesive, and individualized set of Acupuncture Points into which needles can be inserted or pressure can be applied to restore the patient's Chi and address the patient's discrete injuries.

429.   In developing a legitimate acupuncture treatment plan, an acupuncturist may choose from at least 360 discrete Acupuncture Points. Any legitimate acupuncture treatment plan should include the use of both "local" Acupuncture Points (i.e., points near the affected areas of the relevant Meridian), and "distal" Acupuncture Points (i.e., points that are distant from the affected areas of the relevant Meridian).

430.   The third step in any legitimate acupuncture treatment is the implementation of the acupuncture treatment plan.   If performed legitimately, this step typically will involve insertion of between 10 and 20 acupuncture needles into between five and 10 Acupuncture Points for a minimum of 20 minutes. Within these parameters, the number and location of the Acupuncture Points generally will vary based upon the unique circumstances presented by each patient as well as each patient's individual therapeutic response to each acupuncture treatment.

431.   Any legitimate acupuncture treatment plan may permit up to four treatment sessions for the first two weeks of treatment. After this initial stage, the weekly treatment sessions typically should decrease, leaving more time between treatments to assess how long the patient remains pain-free between treatments and/or how long the therapeutic effect of such treatments can be maintained between treatments.

432.   Any legitimate acupuncture treatment plan requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Acupuncture treatment plans are fluid and evolve over time. Therefore, the goal of any legitimate acupuncture treatment plan is to make appropriate adjustments as treatment progresses in order

to improve the therapeutic effectiveness of each treatment, and eventually to return the patient to maximum health by restoring his or her unique energy flow.

433.   Any legitimate acupuncture treatment requires meaningful documentation of the: (i) physical examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) the patient's  progress throughout the course of treatment.

**(ii)   The Acupuncture Defendants' Fraudulent Initial Examinations**

434.   The Acupuncture Defendants purported to begin treatment of nearly every Insured with an initial examination which was billed under CPT code 99203, typically resulting in charges between $54.74 and $80.00.

435.   The charges for the initial examinations were fraudulent in that the examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to illegal kickbacks and the fraudulent treatment protocol established by the Defendants.

436.   Furthermore, the Defendants' charges for the initial examinations were fraudulent in that they misrepresented the extent of the initial examinations.

437.   Specifically, the use of CPT code 99203 typically requires that the practitioner spend 30 minutes of face-to-face time with the Insured or the Insured's family.

438.   Though the Acupuncture Defendants routinely billed for the initial examinations under CPT code 99203, neither Deng nor any other acupuncturist associated with the Acupuncture Defendants spent 30 minutes of face-to-face time with the Insureds or their families during the initial examinations. Rather, the initial examinations rarely lasted more than 10 minutes, to the extent they were conducted at all.

90

439.    In keeping with the fact that the initial examinations rarely lasted more than 10 minutes – to the extent they were conducted at all – the Acupuncture Defendants used pre-printed checklist or template forms in conducting the examinations.

440.    The pre-printed checklist and template forms that the Acupuncture Defendants used in conducting the initial examinations set forth a very limited range of potential patient complaints, potential diagnoses, and treatment recommendations.

441.    All that was required to complete the pre-printed checklist and template forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

442.    These interviews and examinations did not require any acupuncturists associated with the Acupuncture Defendants to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

**(iii)    The Acupuncture Defendants' Fraudulent Acupuncture Treatments**

443.    Following the fraudulent initial examinations, the Acupuncture Defendants purported to provide acupuncture treatments that were billed to GEICO under CPT codes 97810 and 97813, typically resulting in charges of $30.00 and $54.73, respectively for each treatment segment.

444.    The purported "acupuncture" services provided by the Acupuncture Defendants did not remotely comport with any of the aforesaid basic, legitimate acupuncture requirements. Instead, at best, they consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insured's condition and was not designed to effectively treat or otherwise benefit the Insureds. As such, these acupuncture treatments were not medically

necessary. Indeed, they were designed solely to enrich the Defendants through the submission of

fraudulent charges to GEICO and other insurers.

445.   For instance:

(i)   the Insureds' tongues and pulses, if examined at all, had no impact on the nature of the treatment provided – and, in most cases, the Insureds' tongues and pulses were not checked in the first instance;

(ii)   needles were inserted into a small range of common and repetitive Acupuncture Points that were clinically useless, often bore no relation to the diagnosed condition, and appeared to have been pre-determined solely for the sake of expediency;

(iii)   distal Acupuncture Points rarely were used;

(iv)   less than ten needles were used for each treatment session – typically only one or two Acupuncture Points (i.e., using one to six needles in total) were used to treat multiple injuries, and the needles were left in the Insureds' bodies for less than the requisite twenty-minute minimum;

(v)   there was a very high frequency of treatment sessions that were not supported by the alleged injuries and were not adjusted to reflect the Insureds' improvement or lack thereof;

(vi)   in many cases, there was billing for the treatment of injuries when those injuries never actually were treated.  For example, the same treatment points were repeated without change or adjustment and patients with different injuries purportedly received the same treatments;

(vii)   in many cases, injuries noted in the initial acupuncture physical examination reports never were addressed or treated in any manner; and

(viii)   generally, the treatments rendered were inadequate, did not follow the treatment plans established by the initial examinations, if any, and were not intended to actually address the Insureds' injuries.

446.   The Acupuncture Defendants' cookie-cutter approach to the acupuncture

"treatments" that they performed, or caused to be performed, on virtually every Insured clearly

was not based on medical necessity. Instead, the Acupuncture Defendants' cookie-cutter

approach to the acupuncture "treatments" was designed solely to maximize the charges that the Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

447. The Acupuncture Defendants further fraudulently inflated their billing by charging for an "adjunct" acupuncture procedure, known as cupping. Cupping is at best an intermittent treatment, since the act of cupping dredges up stagnant blood and leaves bruises in the application area. Once stagnant blood has been moved, additional cupping is unnecessary – yet the Acupuncture Defendants billed for cupping very frequently, without any evidence of effectiveness.

**11.    The Fraudulent Chiropractic and Physical Therapy Treatment**

448. As part of the Defendants' fraudulent treatment protocol, Lacina, Parisien, Blackman, Dabiri, Masigla, Pavlova, Allay Medical, Mollo, and Island Life (collectively, with the Management Defendants, the "Chiropractic-PT Defendants") purported to subject many Insureds to a series of chiropractic and physical therapy treatments.

449. Like the Defendants' charges for the other Fraudulent Services, the charges for chiropractic treatment and physical therapy treatment were fraudulent in that the chiropractic and physical therapy treatment was performed – to the extent that it was performed at all – pursuant to illegal kickbacks and the fraudulent treatment protocol established by the Defendants.

450. In most cases, the Chiropractic-PT Defendants purported to subject each Insured to dozens of chiropractic and physical therapy treatments over a period of several months, generally resulting in thousands of dollars of charges for each Insured.

451. Virtually none of the Insureds who presented to the Chiropractic-PT Defendants for treatment suffered any injuries at all as the result of the minor automobile accidents they

purportedly experienced, much less any injuries requiring months of physical therapy or chiropractic services.

452.    In most cases, the Insureds did not go to the hospital at all following their putative accidents and, to the extent that they did visit a hospital or other legitimate healthcare provider after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after an hour or two.

453.    Nonetheless, pursuant to the Defendants' fraudulent treatment and billing protocol, following their initial examination/consultations and follow-up examinations, virtually every Insured was prescribed a medically unnecessary, extended course of physical therapy and chiropractic services.

**12.    The Fraudulent Billing for Services Provided by Independent Contractors**

454.    The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors. Under the No-Fault Laws, healthcare providers are ineligible to bill or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the healthcare providers themselves, or by their employees.

455.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing

to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS). Copies of these Opinion Letters are annexed hereto as Exhibit "9."

456.    Even so, the Defendants routinely submitted charges to GEICO and other insurers under the tax identification numbers of Parisien, Masigla, Lacina, Dabiri, Mollo, Island Life, Pavlova, Allay Medical, and Blackman for Fraudulent Services that were provided – to the extent that they were provided at all – by professionals other than Parisien, Masigla, Lacina, Dabiri, Mollo, Pavlova, and Blackman.

457.    To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare providers other than Parisien, Masigla, Lacina, Dabiri, Mollo, Pavlova, and Blackman under their respective tax identification numbers, by Pavlova at Allay Medical, or by Mollo at Island Life were performed by physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians whom the Defendants treated as independent contractors.

458.    For instance, the Defendants:

(i)    paid the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians;

(iv)   failed to secure and maintain W-4 or I-9 forms for the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians;

(v)    failed to withhold federal, state or city taxes on behalf of the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians;

(vi)   compelled the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians to pay for their own malpractice insurance at their own expense;

(vii)  permitted the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians to set their own schedules and days on which they desired to perform services;

(viii) permitted the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)   failed to cover the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians for either unemployment or workers' compensation benefits; and

(x)    filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians were independent contractors.

459.    By electing to treat the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)    avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)   avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

96

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians.

460.    Because the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians were independent contractors and performed the Fraudulent Services, the Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

461.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of Parisien, Masigla, Lacina, Dabiri, Pavlova, Mollo, Blackman, Allay Medical, and Island Life to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

462.    In some cases, the Defendants attempted to conceal the fact that the Fraudulent Services were performed by independent contractors by falsely listing Parisien, Masigla, Lacina, Dabiri, Pavlova, Mollo, or Blackman on the billing as the treating provider.

III.    **The Defendants' Failure to Comply with GEICO's Requests for Additional Verification**

463.    For the reasons set forth above, by 2013, GEICO had – and continues to have – a reasonable basis to seek additional verification from Parisien, Deng, Mollo, Island Life, Pavlova, Dabiri, Blackman, and Masigla (collectively the "EUO Defendants") in order to, among other things, verify the medical necessity of the Fraudulent Services, whether the Fraudulent Services

were provided in the first instance, whether the Defendants were entitled to bill for or to collect No-Fault Benefits with respect to the Fraudulent Services, and to look beyond the facially-valid licenses to determine whether there was a failure to abide by material state and local licensing laws.

464. Accordingly, in 2013 GEICO elected to make formal requests for additional verification from the EUO Defendants. These requests were made in accordance with the insurance policies under which the Defendants' No-Fault claims were submitted, and pursuant to the No-Fault Laws. The object of these requests was to permit the EUO Defendants to answer questions GEICO had about their billing, treatment practices, compliance with licensing regulations, and corporate legitimacy.

465. These requests for additional verification included requests for examinations under oath.

466. Each request by GEICO for an examination under oath and additional verification timely and properly was made pursuant to the No-Fault Laws.

467. The EUO Defendants systematically have failed and/or refused to appear for any examination under oath.

468. The EUO Defendants' systematic failure and/or refusal to appear for examinations under oath constitutes a material breach of GEICO's policies and the No-Fault Laws and, as such, relieves GEICO from any obligation to pay any of their claims.

469. In each instance where the EUO Defendants failed and/or refused to appear for an examination under oath, GEICO issued a timely denial indicating that, among other things, the relevant charge submitted by the provider was denied because it failed to satisfy a condition of coverage.

IV. **The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

470. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

471. The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Provider Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not properly licensed in they were putative healthcare practices that illegally were owned and controlled by unlicensed individuals, and which illegally split fees with unlicensed individuals.

(iv) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Provider Defendants were are in compliance with all material licensing laws and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not in compliance with all material licensing laws in that they paid illegal kickbacks for patient referrals.

(v)     In many cases, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Provider Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Provider Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were not provided by the Provider Defendants' employees

## V.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

472.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

473.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

474.    Specifically, they knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that the Provider Defendants were fraudulently licensed, unlawfully split fees with unlicensed persons, and/or unlawfully paid kickbacks for patient referrals.

475.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal that fact that the Provider Defendants were fraudulently licensed, unlawfully split fees with unlicensed persons, and/or unlawfully paid kickbacks for patient referrals.

476.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted.

477. In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the physicians, chiropractors, physical therapists, acupuncturists, and technicians associated with the Provider Defendants in order to prevent GEICO from discovering that the physicians, chiropractors, physical therapists, acupuncturists, and technicians performing many of the Fraudulent Services – to the extent that they were performed at all – were not employed by the Provider Defendants. In many cases, the Defendants actually misrepresented the identity of the individual who purportedly performed the Fraudulent Services, in order to conceal the fact that the services were performed by independent contractors.

478. What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

479. Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate. Nevertheless, in an attempt to conceal their fraud, the Defendants systematically failed and/or refused to respond to repeated requests for verification of the charges submitted.

480. GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

101

481. In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

482. The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

483. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $893,000.00 based upon the fraudulent charges.

484. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against the Provider Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

485. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 484 above.

486.     There is an actual case in controversy between GEICO and the Provider Defendants regarding more than $4,5,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

487.     The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

488.     The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

489.     The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

490.     The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the Defendants and others.

491.     The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Provider Defendants' employees.

492.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the  Provider Defendants were fraudulently licensed, owned, and controlled by unlicensed individuals and, therefore, were ineligible to bill for or to collect no-fault benefits.

493.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants unlawfully split fees with unlicensed individuals and, therefore, were ineligible to bill for or to collect no-fault benefits.

494.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants have failed and/or refused to comply with GEICO's lawful requests for additional verification.

495.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Parisien and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

496.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 495 above.

497.    Parisien's medical practice (the "Parisien Practice") is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

498.    Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Parisien Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud

statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that the Parisien Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Parisien Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

499.    The Parisien Practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Parisien and the Management Defendants operated the Parisien Practice, inasmuch as the Parisien Practice never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Parisien Practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Parisien Practice to the present day.

500.   The Parisien Practice is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. The Parisien Practice likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Parisien Practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

501.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $263,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Parisien Practice.

502.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Parisien and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

503.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 502 above.

504.   The Parisien Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

505.   Parisien, Tuano, Tanglao, and John Doe Defendants 1-10  are employed by and/or associated with the Parisien Practice.

506.   Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the

Parisien Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that the Parisien Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Parisien Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

507.    Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

508.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $263,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Parisien Practice.

509.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Parisien and the Management Defendants
### (Common Law Fraud)

510.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 509 above.

511.    Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

512.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Parisien Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that the Parisien Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the Parisien Practice was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for

services not actually performed by Parisien, the representation that the billed-for services were performed by the Parisien Practice's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

513.  Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Parisien Practice that were not compensable under the No-Fault Laws.

514.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $263,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Parisien Practice.

515.  The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

516.  Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Parisien and the Management Defendants
### (Unjust Enrichment)

517.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 516 above.

518.  As set forth above, Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

519.   When GEICO paid the bills and charges submitted by or on behalf of the Parisien Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

520.   Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

521.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

522.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $263,000.00.

## SIXTH CAUSE OF ACTION
### Against Pavlova and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

523.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 522 above.

524.   Pavlova's medical practice and Allay Medical (the "Pavlova Practice") together constitute an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

525.   Pavlova, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Pavlova Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that the Pavlova Practice was not eligible to receive under the No-Fault Laws because:

110

(i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Pavlova Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

526. The Pavlova Practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Pavlova and the Management Defendants operated the Pavlova Practice, inasmuch as the Pavlova Practice never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Pavlova Practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Pavlova Practice to the present day.

527. The Pavlova Practice is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. The Pavlova Practice likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent

billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Pavlova Practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

528.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $163,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Pavlova Practice.

529.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Pavlova and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

530.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 529 above.

531.    The Pavlova Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

532.    Pavlova, Tuano, Tanglao, and John Doe Defendants 1-10  are employed by and/or associated with the Pavlova Practice.

533.    Pavlova, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Pavlova Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that the Pavlova Practice was not eligible to receive

under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Pavlova Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

534.    Pavlova, Tuano, Tanglao, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

535.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $163,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Pavlova Practice.

536.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Pavlova, the Management Defendants, and Allay Medical
### (Common Law Fraud)

537.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 536 above.

538.    Pavlova, Allay Medical, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

539.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Pavlova Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that the Pavlova Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the Pavlova Practice was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Pavlova, the representation that the billed-for services were performed by the Pavlova Practice's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

114

540.    Pavlova, Allay Medical, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Pavlova Practice that were not compensable under the No-Fault Laws.

541.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $163,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Pavlova Practice.

542.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

543.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Pavlova, Allay Medical, and the Management Defendants
### (Unjust Enrichment)

544.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 543 above.

545.    As set forth above, Pavlova, Allay Medical, Tuano, Tanglao, and John Doe Defendants 1-10  have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

546.    When GEICO paid the bills and charges submitted by or on behalf of the Pavlova Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

547.    Pavlova, Allay Medical, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

548.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

549.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $163,000.00.

**TENTH CAUSE OF ACTION**
**Against Dabiri and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

550.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 549 above.

551.    Dabiri's medical practice (the "Dabiri Practice") is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

552.    Dabiri, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Dabiri Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five months seeking payments that the Dabiri Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were

performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Dabiri Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

553.    The Dabiri Practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dabiri and the Management Defendants operated the Dabiri Practice, inasmuch as the Dabiri Practice never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Dabiri Practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Dabiri Practice to the present day.

554.    The Dabiri Practice is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. The Dabiri Practice likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Dabiri

Practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

555.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $86,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Dabiri Practice.

556.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**Against Dabiri and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

557.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 556 above.

558.   The Dabiri Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

559.   Dabiri, Tuano, Tanglao, and John Doe Defendants 1-10  are employed by and/or associated with the Dabiri Practice.

560.   Dabiri, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Dabiri Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five months seeking payments that the Dabiri Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii)

it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Dabiri Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

561.    Dabiri, Tuano, Tanglao, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

562.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $86,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Dabiri Practice.

563.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Dabiri and the Management Defendants
### (Common Law Fraud)

564.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 563 above.

565.    Dabiri, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

566.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Dabiri Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that the Dabiri Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the Dabiri Practice was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Dabiri, the representation that the billed-for services were performed by the Dabiri Practice's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

120

567.    Dabiri, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Dabiri Practice that were not compensable under the No-Fault Laws.

568.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $86,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Dabiri Practice.

569.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

570.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against Dabiri and the Management Defendants
### (Unjust Enrichment)

571.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 570 above.

572.    As set forth above, Dabiri, Tuano, Tanglao, and John Doe Defendants 1-10  have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

573.    When GEICO paid the bills and charges submitted by or on behalf of the Dabiri Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

574.     Dabiri, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

575.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

576.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $86,000.00.

### FOURTEENTH CAUSE OF ACTION
**Against Blackman and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

577.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 576 above.

578.     Blackman's medical practice (the "Blackman Practice") is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

579.     Blackman, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Blackman Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that the Blackman Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the

122

Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Blackman Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4."

580. The Blackman Practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Blackman and the Management Defendants operated the Blackman Practice, inasmuch as the Blackman Practice never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Blackman Practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Blackman Practice to the present day.

581. The Blackman Practice is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. The Blackman Practice likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Blackman Practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

123

582.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $177,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Blackman Practice.

583.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FIFTEENTH CAUSE OF ACTION**
**Against Blackman and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

584.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 583 above.

585.   The Blackman Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

586.   Blackman, Tuano, Tanglao, and John Doe Defendants 1-10  are employed by and/or associated with the Blackman Practice.

587.   Blackman, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Blackman Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that the Blackman Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol

designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Blackman Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

588.    Blackman, Tuano, Tanglao, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

589.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $177,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Blackman Practice

590.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against Blackman and the Management Defendants
### (Common Law Fraud)

591.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 590 above.

592.    Blackman, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and

knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

593. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Blackman Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that the Blackman Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the Blackman Practice was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Blackman, the representation that the billed-for services were performed by the Blackman Practice's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

594. Blackman, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Blackman Practice that were not compensable under the No-Fault Laws.

595.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $177,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Blackman Practice.

596.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

597.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTEENTH CAUSE OF ACTION
**Against Blackman and the Management Defendants
(Unjust Enrichment)**

598.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 597 above.

599.    As set forth above, Blackman, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

600.    When GEICO paid the bills and charges submitted by or on behalf of the Blackman Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

601.    Blackman, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

602.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

603.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $177,000.00.

## EIGHTEENTH CAUSE OF ACTION
### Against Lacina and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

604.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 603 above.

605.   Lacina's medical practice (the "Lacina Practice") is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

606.   Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Lacina Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over one year seeking payments that the Lacina Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Lacina Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the

128

pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5."

607.    The Lacina Practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lacina and the Management Defendants operated the Lacina Practice, inasmuch as the Lacina Practice never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Lacina Practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Lacina Practice to the present day.

608.    The Lacina Practice is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. The Lacina Practice likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Lacina Practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

609.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $67,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Lacina Practice.

610.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**NINETEENTH CAUSE OF ACTION**
**Against Lacina and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

611.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 610 above.

612.    The Lacina Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

613.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10  are employed by and/or associated with the Lacina Practice.

614.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Lacina Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over one year seeking payments that the Lacina Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Lacina Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that

purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

615.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

616.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $67,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Lacina Practice

617.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTIETH CAUSE OF ACTION
#### Against Lacina and the Management Defendants
#### (Common Law Fraud)

618.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 617 above.

619.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

620.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Lacina Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that the Lacina Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the Lacina Practice was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Lacina, the representation that the billed-for services were performed by the Lacina Practice's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

621.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Lacina Practice that were not compensable under the No-Fault Laws.

622.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $67,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Lacina Practice.

623.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

624.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
**Against Lacina and the Management Defendants**
**(Unjust Enrichment)**

625.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 624 above.

626.    As set forth above, Lacina, Tuano, Tanglao, and John Doe Defendants 1-10  have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

627.    When GEICO paid the bills and charges submitted by or on behalf of the Lacina Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

628.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

629.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

630.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $67,000.00.

**TWENTY-SECOND CAUSE OF ACTION**
**Against Mollo and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

631.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 630 above.

632.    Mollo's chiropractic practice and Island Life (the "Mollo Practice") together constitute an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

633.    Mollo, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Mollo Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that the Mollo Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-chiropractors; (ii) it engaged in fee-splitting with non-chiropractors; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Mollo Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6."

134

634.   The Mollo Practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mollo and the Management Defendants operated the Mollo Practice, inasmuch as the Mollo Practice never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Mollo Practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Mollo Practice to the present day.

635.   The Mollo Practice is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-chiropractors, and unlawfully pays for patient referrals. The Mollo Practice likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Mollo Practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

636.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $42,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Mollo Practice.

637.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-THIRD CAUSE OF ACTION
### Against Mollo and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

638.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 637 above.

639.    The Mollo Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

640.    Mollo, Tuano, Tanglao, and John Doe Defendants 1-10  are employed by and/or associated with the Mollo Practice.

641.    Mollo, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Mollo Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that the Mollo Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-chiropractors; (ii) it engaged in fee-splitting with non-chiropractors; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Mollo Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint

136

are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

642.    Mollo, Tuano, Tanglao, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

643.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $42,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Mollo Practice

644.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FOURTH CAUSE OF ACTION
### Against Mollo, the Management Defendants, and Island Life
### (Common Law Fraud)

645.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 644 above.

646.    Mollo, Island Life, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

647.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Mollo Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

137

5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-chiropractors; (ii) in every claim, the representation that the Mollo Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the Mollo Practice was not properly licensed in that it engaged in illegal fee-splitting with non-chiropractors and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Mollo, the representation that the billed-for services were performed by the Mollo Practice's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

648.    Mollo, Island Life, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Mollo Practice that were not compensable under the No-Fault Laws.

649.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $42,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Mollo Practice.

650.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

651.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against Mollo, Island Life, and the Management Defendants
### (Unjust Enrichment)

652.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 651 above.

653.     As set forth above, Mollo, Island Life, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

654.     When GEICO paid the bills and charges submitted by or on behalf of the Mollo Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

655.     Mollo, Island Life, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

656.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

657.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $42,000.00.

## TWENTY-SIXTH CAUSE OF ACTION
### Against Deng and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

658.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 657 above.

659.    Deng's acupuncture practice (the "Deng Practice") is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

660.    Deng, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Deng Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that the Deng Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Deng Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7."

140

661.    The Deng Practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Deng and the Management Defendants operated the Deng Practice, inasmuch as the Deng Practice never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Deng Practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Deng Practice to the present day.

662.    The Deng Practice is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-acupuncturists, and unlawfully pays for patient referrals. The Deng Practice likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Deng Practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

663.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $26,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Deng Practice.

664.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-SEVENTH CAUSE OF ACTION**
**Against Deng and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

665.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 664 above.

666.    The Deng Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

667.    Deng, Tuano, Tanglao, and John Doe Defendants 1-10  are employed by and/or associated with the Deng Practice.

668.    Deng, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Deng Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that the Deng Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Deng Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint

are described, in part, in the chart annexed hereto as Exhibit "7". Each such mailing was made in furtherance of the mail fraud scheme.

669.    Deng, Tuano, Tanglao, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

670.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $26,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Deng Practice.

671.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-EIGHTH CAUSE OF ACTION
### Against Deng and the Management Defendants
### (Common Law Fraud)

672.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 671 above.

673.    Deng, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

674.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Deng Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

143

5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-acupuncturists; (ii) in every claim, the representation that the Deng Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the Deng Practice was not properly licensed in that it engaged in illegal fee-splitting with non-acupuncturists and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Deng, the representation that the billed-for services were performed by the Deng Practice's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

675. Deng, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Deng Practice that were not compensable under the No-Fault Laws.

676. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $26,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Deng Practice.

677. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

678.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
### Against Deng and the Management Defendants
### (Unjust Enrichment)

679.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 678 above.

680.    As set forth above, Deng, Tuano, Tanglao, and John Doe Defendants 1-10  have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

681.    When GEICO paid the bills and charges submitted by or on behalf of the Deng Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

682.    Deng, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

683.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

684.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $26,000.00.

## THIRTIETH CAUSE OF ACTION
### Against Masigla and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

685.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 684 above.

686.    Masigla's physical therapy practice (the "Masigla Practice") is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

687.    Masigla, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Masigla Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that the Masigla Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physical therapists; (ii) it engaged in fee-splitting with non-physical therapists; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Masigla Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8."

688.    The Masigla Practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Masigla and the Management Defendants operated the Masigla Practice, inasmuch as the Masigla Practice never was eligible to bill for or collect No-

146

Fault Benefits, and acts of mail fraud therefore were essential in order for the Masigla Practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Masigla Practice to the present day.

689.   The Masigla Practice is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physical therapists, and unlawfully pays for patient referrals. The Masigla Practice likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Masigla Practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

690.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $66,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Masigla Practice.

691.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRTY-FIRST CAUSE OF ACTION**
**Against Masigla and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

692.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 691 above.

147

693.   The Masigla Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

694.   Masigla, Tuano, Tanglao, and John Doe Defendants 1-10  are employed by and/or associated with the Masigla Practice.

695.   Masigla, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Masigla Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that the Masigla Practice was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physical therapists; (ii) it engaged in fee-splitting with non-physical therapists; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Masigla Practice employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8". Each such mailing was made in furtherance of the mail fraud scheme.

696.   Masigla, Tuano, Tanglao, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other

insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

697.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $66,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Masigla Practice

698.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-SECOND CAUSE OF ACTION
### Against Masigla and the Management Defendants
### (Common Law Fraud)

699.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 698 above.

700.    Masigla, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

701.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Masigla Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physical therapists; (ii) in every claim, the representation that the Masigla Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the

Masigla Practice was not properly licensed in that it engaged in illegal fee-splitting with non-physical therapists and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Masigla, the representation that the billed-for services were performed by the Masigla Practice's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

702.   Masigla, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Masigla Practice that were not compensable under the No-Fault Laws.

703.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $66,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Masigla Practice.

704.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

705.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTY-THIRD CAUSE OF ACTION
### Against Masigla and the Management Defendants
### (Unjust Enrichment)

706.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 705 above.

707.    As set forth above, Masigla, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

708.    When GEICO paid the bills and charges submitted by or on behalf of the Masigla Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

709.    Masigla, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

710.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

711.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $66,000.00.

## THIRTY-FOURTH CAUSE OF ACTION
### Against Parisien, Deng, Mollo, Masigla, Lacina, Pavlova, Dabiri, Blackman, Tuano, Tanglao, and John Doe Defendants 1-10
### (Violation of RICO, 18 U.S.C. § 1962(c))

712.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 711 above.

713.    The Parisien Practice, Deng Practice, Mollo Practice, Masigla Practice, Lacina Practice, Pavlova Practice, Dabiri Practice, and Blackman Practice together constitute an association-in-fact "enterprise" (the "No-Fault Insurance Fraud Enterprise") as that term is

defined in 18 U.S.C. § 1961(4), that engaged in, and the activities of which affected, interstate commerce.

714.    The members of the No-Fault Insurance Fraud Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Parisien Practice, Deng Practice, Mollo Practice, Masigla Practice, Lacina Practice, Pavlova Practice, Dabiri Practice, and Blackman Practice ostensibly are independent healthcare practices, with different names and tax identification numbers,  that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other insurers.

715.    The No-Fault Insurance Fraud Enterprise has been operated under at least 10 different provider names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company. The No-Fault Insurance Fraud Enterprise also has been operated under at least 10 corporate names in order to give the false appearance that the patient referrals between and among the members of the No-Fault Insurance Fraud Enterprise for the Fraudulent Services were arm's-length, legitimate referrals for medically necessary services, when in fact they were not. Accordingly, the execution of this scheme would be beyond the capacity of each member of the No-Fault Insurance Fraud Enterprise acting singly or without the aid of the others.

716.    The No-Fault Insurance Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been

152

responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

717.    Parisien, Deng, Mollo, Masigla, Lacina, Pavlova, Dabiri, Blackman, Tuano, Tanglao, and John Doe Defendants 1-10  were employed by and/or associated with the No-Fault Insurance Fraud Enterprise.

718.    Parisien, Deng, Mollo, Masigla, Lacina, Pavlova, Dabiri, Blackman, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of the No-Fault Insurance Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that the No-Fault Insurance Fraud Enterprise was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the No-Fault Insurance Fraud Enterprise paid illegal kickbacks in

exchange for patient referrals; (vi) the No-Fault Insurance Fraud Enterprise was operated through healthcare practices that secretly and illegally were owned and controlled by unlicensed non-professionals;  (vi) the No-Fault Insurance Fraud Enterprise engaged in unlawful fee-splitting; and (vii) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by employees of the members of the No-Fault Insurance Fraud Enterprise. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "8".

719.    The No-Fault Insurance Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Parisien, Deng, Mollo, Masigla, Lacina, Pavlova, Dabiri, Blackman, Tuano, Tanglao, and John Doe Defendants 1-10 operate the No-Fault Insurance Fraud Enterprise, insofar as the enterprise is not engaged in a legitimate healthcare practice, and acts of mail fraud therefore are essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the No-Fault Insurance Fraud Enterprise to the present day.

720.    The No-Fault Insurance Fraud Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the No-Fault Insurance

Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

721.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $893,000.00 pursuant to the fraudulent bills submitted through the No-Fault Insurance Fraud Enterprise.

722.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRTY-FIFTH CAUSE OF ACTION
**Against Parisien, Deng, Mollo, Masigla, Lacina, Pavlova, Dabiri, Blackman, Tuano, Tanglao, and John Doe Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

723.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 722 above.

724.     Parisien, Deng, Mollo, Masigla, Lacina, Pavlova, Dabiri, Blackman, Tuano, Tanglao, and John Doe Defendants 1-10  are employed by and/or associated with the No-Fault Insurance Fraud Enterprise.

725.     Parisien, Deng, Mollo, Masigla, Lacina, Pavlova, Dabiri, Blackman, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the No-Fault Insurance Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that the No-Fault Insurance Fraud Enterprise was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically

necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the No-Fault Insurance Fraud Enterprise paid illegal kickbacks in exchange for patient referrals; (vi) the No-Fault Insurance Fraud Enterprise was operated through healthcare practices that secretly and illegally were owned and controlled by unlicensed non-professionals; (vi) the No-Fault Insurance Fraud Enterprise engaged in unlawful fee-splitting; and (vii) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by employees of the members of the No-Fault Insurance Fraud Enterprise. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "8". Each such mailing was made in furtherance of the mail fraud scheme.

726.    Parisien, Deng, Mollo, Masigla, Lacina, Pavlova, Dabiri, Blackman, Tuano, Tanglao, and John Doe Defendants 1-10  knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

727.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $893,000.00 pursuant to the fraudulent bills submitted through the No-Fault Insurance Fraud Enterprise.

728.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## JURY DEMAND

729.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $263,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $263,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Parisien, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial

but in excess of $263,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

      E.      On the Fifth Cause of Action against Parisien, Tuano, Tanglao, and John Doe Defendants 1-10, more than $263,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

      F.      On the Sixth Cause of Action against Pavlova, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $163,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      G.      On the Seventh Cause of Action against Pavlova, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $263,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      H.      On the Eighth Cause of Action against Pavlova, Allay Medical, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $163,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

      I.      On the Ninth Cause of Action against Pavlova, Allay Medical, Tuano, Tanglao, and John Doe Defendants 1-10, more than $163,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

      J.      On the Tenth Cause of Action against Dabiri, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial

but in excess of $86,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Dabiri, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $86,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Dabiri, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $86,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Dabiri, Tuano, Tanglao, and John Doe Defendants 1-10, more than $86,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Blackman, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $177,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Blackman, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $177,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.      On the Sixteenth Cause of Action against Blackman, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at

159

trial but in excess of $177,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Blackman, Tuano, Tanglao, and John Doe Defendants 1-10, more than $177,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $67,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $67,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.      On the Twentieth Cause of Action against Lacina, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $67,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Lacina, Tuano, Tanglao, and John Doe Defendants 1-10, more than $67,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

V.      On the Twenty-Second Cause of Action against Mollo, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at

trial but in excess of $42,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.      On the Twenty-Third Cause of Action against Mollo, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $42,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.      On the Twenty-Fourth Cause of Action against Mollo, Island Life, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $42,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.      On the Twenty-Fifth Cause of Action against Mollo, Island Life, Tuano, Tanglao, and John Doe Defendants 1-10, more than $67,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

Z.      On the Twenty-Sixth Cause of Action against Deng, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $26,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

AA.    On the Twenty-Seventh Cause of Action against Deng, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $26,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.    On the Twenty-Eighth Cause of Action against Deng, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at

trial but in excess of $26,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

CC.   On the Twenty-Ninth Cause of Action against Deng, Tuano, Tanglao, and John Doe Defendants 1-10, more than $26,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

DD.   On the Thirtieth Cause of Action against Masigla, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $66,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

EE.   On the Thirty-First Cause of Action against Masigla, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $66,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

FF.   On the Thirty-Second Cause of Action against Masigla, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $66,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

GG.   On the Thirty-Third Cause of Action against Masigla, Tuano, Tanglao, and John Doe Defendants 1-10, more than $66,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

HH.   On the Thirty-Fourth Cause of Action against Parisien, Deng, Mollo, Masigla, Lacina, Pavlova, Dabiri, Blackman, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$893,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

II.     On the Thirtieth Cause of Action against Parisien, Deng, Mollo, Masigla, Lacina, Pavlova, Dabiri, Blackman, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $893,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: February 12,  2016

RIVKIN RADLER LLP


By: _____
Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
Frank P. Tiscione (FT 5396)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*

3266219 v7

163